# United States Court of Appeals

*for the*

# Third Circuit

Case No. 15-2859

UNITED STATES OF AMERICA,

– v. –

ONE (1) PALMETTO STATE ARMORY PA-15 MACHINEGUN
RECEIVER/FRAME UNKNOWN CALIBER, SERIAL NUMBER LW001804;
WATSON FAMILY GUN TRUST,

*Claimant,*

(D.C. No. 15-cv-02202)

RYAN S. WATSON, Individually and
as Trustee of the Watson Family Gun Trust,

*Appellant,*

– v. –

ATTORNEY GENERAL UNITED STATES OF AMERICA; DIRECTOR
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*Appellee.*

(D.C. No. 14-cv-06569)

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D. CT. CIVIL NO. 2:15-CV-02202 (CONSOLIDATED WITH 2:14-CV-06569)
(THE HONORABLE JUDGE STEWART DALZELL)

## BRIEF AND APPENDIX FOR APPELLANT
## VOLUME I OF II (Pages A1-A61)

ALAN ALEXANDER BECK
LAW OFFICE OF ALAN BECK
4780 Governor Drive
San Diego, California 92122
(619) 905-9105

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. Box 4008
Madison, Mississippi 39130
(601) 852-3440

*Attorneys for Appellant*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................2

STATEMENT OF JURISDICTION.......................................................2

STATEMENT OF THE ISSUES PRESENTED .....................................3

STATEMENT OF RELATED CASES ...................................................3

STATEMENT OF THE CASE................................................................4

      A.     Statutory Background........................................................4

      B.     Factual and Procedural Background ..................................8

SUMMARY OF ARGUMENT .............................................................10

REVIEWABILITY AND STANDARD OF REVIEW...........................11

ARGUMENT .......................................................................................12

I.     THE CHALLENGED LAWS ARE UNCONSTITUTIONAL
     FACIALLY AND AS-APPLIED TO WATSON ........................18

      A.     The Challenged Laws Burden Second Amendment Rights................18

           i.      Defendants Misapply Heller's Dangerous and Unusual
                 Language ................................................................18

           ii.     Defendants Complete Ban on Machineguns is
                 Categorically Invalid................................................24

           iii.    U.S. v. Marzzarella Supports Applying a Categorical
                 Approach ................................................................25

           iv.    The 1934 Hearing on National Firearms Act Supports
                 That A Categorical Ban Would Be Unconstitutional ..............26

           v.      The Ban on Machineguns in § 922(o) is not
                 Longstanding or Presumptively Lawful .....................27

           vi.    If Means-End Scrutiny is Necessary, Strict Scrutiny
                 Should Be Applied ..................................................29

i

      vii.    Even if Means-End Scrutiny Applies, Defendants Fail
           Their Burden ............................................................................35

      viii.   Defendants Misread *United States v. Miller* ............................42

      ix.    *Miller* Provides the Outer Limits for the Second
           Amendment Right ...................................................................44

      x.     "Common Use" is the Output of the *Miller* Test .....................46

II.    BY ITS CLEAR LANGUAGE, THE GUN CONTROL ACT DOES
      NOT APPLY TO THE WATSON FAMILY GUN TRUST

    **a.**    The Watson Family Gun Trust Machinegun Transaction is
         Exempt From the NICS Check.............................................................50

    **b.**    If, as BATFE Admits, a Trust is Not A Person, Then a Trust
         Can Register and Possess a Machinegun ...........................................53

CONCLUSION .........................................................................................57

REQUIRED CERTIFICATIONS .............................................................58

CERTIFICATE OF SERVICE ................................................................59

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)......................................................................37

*Baron Snigge v. Shirton*,
    79 E.R. 173 (1607)......................................................................19

*Citizens United v. Fed. Election Commn.*,
    558 U.S. 310 (2010).....................................................................30

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...............................................................*passim*

*Edenfield*,
    507 U.S. at 770-71 ......................................................................37

*English v. State*,
    35 Tex. 473 (1871) ......................................................................23

*Evancho v. Fisher*,
    423 F.3d 347 (3d Cir. 2005) ........................................................11

*Fotoudis v. Honolulu*,
    2014 WL 4662385 (D. Haw. 2014)............................................41

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ........................................................11

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
    14-2767, 2014 WL 7172253 (3d Cir. Dec. 17, 2014) ..................31

*Heller v. D.C.*,
    670 F.3d 1244 (D.C. Cir. 2011)..................................................24

*In re Fosamax (Alendronate Sodium) Products Liab. Litig. (No. II)*,
    751 F.3d 150 (3d Cir. 2014) ..........................................................3

*Lawson v. Suwannee Fruit & Steamship Co.*,
    336 U.S. 198 (1949)....................................................................56

*Lewis v. Alexander*,
    685 F.3d 325 (3d Cir. 2012) ........................................................56

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001).....................................................................37

*Lum v. Bank of America*,
    361 F.3d 217 (3d Cir.2004) ...........................................................................11

*McCullen v. Coakley*,
    Id. at 712 ...................................................................................................41

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010)...........................................................................10, 13

*McTernan v. City of York, Penn.*,
    577 F.3d 521 (3d Cir. 2009) .......................................................................11

*Meese v. Keene*,
    481 U.S. 465 (1987)...............................................................................32, 56

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ......................................................................41

*O'Neill v. State*,
    16 Ala. 65, 67 (1849)..................................................................................23

*Reid*,
    1 Ala. at 616–17..........................................................................................24

*Rex v. Knight*,
    90 Eng. Rep. 330 (K.B. 1686) ....................................................................21

*Rex v. Rowland Phillips*,
    98 E.R. ( 1385 )...........................................................................................19

*State v. Herrmann*,
    2015AP53-CR, 2015 WL 7432597 (Wis. App. Nov. 24, 2015)...................49

*State v. Langford*,
    10 N.C. (3 Hawks) 381 (1824) ...................................................................23

*State v. Lanier*,
    71 N.C. 288 (1874) .....................................................................................23

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*,
    450 U.S. 707 (1981)....................................................................................36

*Turner Broad. Sys. v. F.C.C.*,
    520 U.S. 180 (1997).....................................................................................37

*Tyler v. Hillsdale County Sheriff's Dept.*,
    775 F.3d 308 (6th Cir. 2014), *reh'g en banc granted, opinion*
    *vacated* (Apr. 21, 2015) ................................................................30

*U.S. v. Golding*,
    332 F.3d 838 (5th Cir. 2003) ....................................................28

*U.S. v. Kirk*,
    105 F.3d 997 (5th Cir. 1997) ....................................................28

*U.S. v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ..................................................*passim*

*United States v. Chester*,
    628 F.3d 673 (4th Cir. 2010) ..............................................34, 37

*United States v. Chovan*,
    735 F.3d 1127 (9th Cir.2013) ....................................................37

*United States v. Hare*,
    26 F. Cas. 148 (C.C.D. Md. 1818) ..........................................19

*United States v. Miller*,
    307 U.S. 174 (1939) ..........................................................*passim*

*United States v. Reese*,
    627 F.3d 792 (10th Cir. 2010) ..................................................37

## <u>STATUTES</u>

10 U.S.C. § 311(b) ........................................................................15

18 U.S.C. § 921 ......................................................................7, 31

18 U.S.C. § 921(a)(1)..................................................8, 51, 52, 53

18 U.S.C. § 921(a)(1)(A) ..............................................................55

18 U.S.C. § 922(o) ..............................................................*passim*

18 U.S.C. § 922(t)(1) ............................................47, 51, 52, 53

18 U.S.C. § 922(t)(3)(B) ......................................................51, 53

18 U.S.C. § 3571(b) ........................................................................4

26 U.S.C. § 5801 ......................................................................1, 2

26 U.S.C. § 5812..........................................................................4

26 U.S.C. § 5822 ........................................................................................4

26 U.S.C. § 5845 ........................................................................................3

26 U.S.C. § 5845(b) ...................................................................................4

26 U.S.C. § 5861(d) ...................................................................................4

26 U.S.C. § 7701(a)(1) ..............................................................................8

28 U.S.C. § 1331 ........................................................................................2

28 U.S.C. § 1346 ........................................................................................2

28 U.S.C. § 2201 ........................................................................................2

28 U.S.C. § 2202 ........................................................................................2

27 C.F.R. § 479.11 ...................................................................................52

27 C.F.R. § 479.85 ...................................................................................50

27 C.F.R. § 479.105(a) ..............................................................................1

Fed. R. Civ. P. 12(b)(1) .............................................................................9

78 Fed. Reg. 55016 ...............................................................50, 51, 53, 55

Firearm Owners' Protection Act § 102(9) ...................................1, 6, 31

Militia Act of 1792 .................................................................................14

Militia Act of 1903 .................................................................................14

The National Defense Act of 1916 .........................................................14

## <u>OTHER AUTHORITIES</u>

132 Cong. Rec. H1750 (1986) ..................................................................7

78 *Fed. Reg*. 55014 ................................................................................51

A. Scalia & B. Garner, *Reading Law* at 352-53 (West: 2012) ...............53

*Armor Piercing Ammunition and the Criminal Misuse of and Availability
of Machineguns and Silencers: Hearings on H.R. 641 and Related
bills Before the Committee on the Judiciary, 98th Congress, 1st Sess.
132* (1984)...............................................................................................38

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN
FORCE IN KENTUCKY 482 (1822) ....................................................22

David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789 (1982) ............................................................21

Declaration of Independence, Clause 2, July 4, 1776.............................................16

James Wilson, WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson ed., 1804) ...................................................21

John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) .......................................21

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994) ......................................21

Marianne W. Zawitz, Guns Used in Crime, U.S. DEPARTMENT OF JUSTICE (July 1995) .....................................................39

National Firearms Act:  Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 6 (1934).....................................................4

## TREATISES

A Treatise on the Criminal Law of the United States by Francis Whartson (1874)................................................................18

TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788) ...............................................................21

William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769)..............................................................20

William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826) ...........................................22

**INTRODUCTION**

Appellant, Ryan S. Watson, Individually and as Trustee of the Watson Family Gun Trust ("Watson") challenges the constitutionality of 18 U.S.C. § 922(o), 26 U.S.C. § 5801 *et seq.* and the implementing regulations 27 C.F.R. § 479.105(a).  18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun manufactured after May 19, 1986.  This provision was enacted in 1986 as § 102(9) of the Firearm Owners' Protection Act, which amended the Gun Control Act of 1968.  Machineguns are additionally regulated through the National Firearms Act ("NFA"), codified at 26 U.S.C. § 5801 et seq.  The NFA imposes a $200 tax on machineguns, suppressors, short-barreled rifles, short-barreled shotguns and destructive devices.  Despite the ban on post-May 19, 1986 machineguns and the tax upon them, there are tens of thousands, if not hundreds of thousands, of machineguns lawfully possessed by private individuals.  But for the ban, there would likely be hundreds of thousands more lawfully possessed by private individuals.

Watson was given permission by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") to make a machinegun by approving his ATF Form 5320.1 ("Form 1").  Watson subsequently made the authorized machinegun.  The BATFE later revoked the approved Form 1 and mandated that Watson surrender the machinegun, which he did under protest.  Watson then filed his Complaint in

1

district court challenging the constitutionality of the offending statutes facially and as-applied on Second Amendment grounds and contending that the Appellees violated Watson's Equal Protection and Due Process rights.  The district court granted Defendants' Motion to Dismiss or Alternatively, for Summary Judgment in part, finding that Watson had standing to bring his challenge but ultimately granting Defendants' Motion to Dismiss.

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant respectfully requests oral argument in this case.  The district court held that the Second Amendment does not extend to machineguns.  The Appellant believes that oral argument could provide substantial assistance to this Court in understanding the important issues in this case.

## STATEMENT OF JURISDICTION

Watson brings this action for declarative and injunctive relief, claiming that 18 U.S.C. § 922(o), 26 U.S.C. § 5801 et seq. is unconstitutional both facially and as applied to him. The statutory provisions, cited above, violate Watson's rights as guaranteed by the Second and Fifth Amendments to the United States Constitution. Accordingly, the district court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 2201 and 2202.

On July 18, 2015, the District Court granted Defendants' Motion for Summary Judgment. Watson filed his Notice of Appeal on August 1, 2015 which

this Court slated for possible dismissal. A54. Watson filed a Motion for Rule 54(b) certification which was granted by the district court on August 13, 2015 and any jurisdictional defect was cured by the Rule 54(b) certification. A57-A60. See *In re Fosamax (Alendronate Sodium) Products Liab. Litig. (No. II)*, 751 F.3d 150, 156 (3d Cir. 2014). Judgment was entered on August 13, 2015. A61. As the premature appeal is now timely, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED

Whether the district court erred in granting Defendants' Motion to Dismiss or in the Alternative for Summary Judgement, when it held: (A) Defendants' conduct does not violate the Equal Protection Clause of the Fifth Amendment; (B) 18 U.S.C. § 922(o) and 26 U.S.C. § 5845 are constitutional facially and as-applied to Watson; (C) that Watson's Due Process rights were not violated by the BATFE; and (D) whether the plain language of 18 U.S.C. § 922(o) prohibits trusts from making and possessing post-May 19, 1986 machineguns.

## STATEMENT OF RELATED CASES

This case has not previously been before any court other than the district court, and there are no currently pending related cases.

## STATEMENT OF THE CASE

### A. Statutory Background

The National Firearms Act ("NFA") regulates the manufacture and transfer of certain firearms by, in sum, requiring a person proposing to make or transfer an NFA firearm to: (1) file an application with the BATFE; (2) obtain BATFE approval; (3) have the firearm registered in the National Firearms Registration and Transfer Record (completed by BATFE upon approval); and (4) pay a $200.00 tax which is evidenced by the BATFE's attachment of a tax stamp on the application, which is then returned to the maker or transferor.  26 U.S.C. §§ 5812 and 5822. Possession of an NFA firearm not registered to the possessor is a felony punishable by ten years imprisonment and a fine of $250,000.00.  26 U.S.C. § 5861(d), 18 U.S.C. § 3571(b).  Machineguns, defined under federal law as any firearm capable of firing more than one round automatically by a single function of the trigger, fall under the NFA's purview.  26 U.S.C. § 5845(b).

The constitutionality of the original NFA bill was debated, with then-Attorney General Homer Cummings admitting that a ban on machineguns may not survive Constitutional scrutiny unless reached through Congress' power to tax. National Firearms Act:  Hearings Before the House Committee on Ways and Means, 73rd Cong., 2d Sess., 6 (1934).  Cummings denied that machineguns could be banned, because "we have no inherent police power to go into certain localities

and deal with local crime. It is only when we can reach those things under the interstate commerce provision, or under the use of the mails, or by the power of taxation, that we can act." Specifically, Cummings felt that, if it were purely a taxing statute, it would survive scrutiny. The following exchange is on point:

> **Mr. David J. Lewis, Maryland:** … Lawyer though I am, I have never quite understood how the laws of the various States have been reconciled with the provision in our Constitution denying the privilege to the legislature to take away the right to carry arms. Concealed-weapon laws, of course, are familiar in the various states; there is a legal theory upon which we prohibit the carrying of weapons – the smaller weapons.

> **Attorney General Homer Cummings**: … Machine guns, however, are not of that class. Do you have any doubt as to the power of the Government to deal with machine guns as they are transported in interstate commerce?

> **Mr. Lewis**: I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.

> **AG Cummings**: Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. *You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved.* But when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated," you are easily within the law.

> **Mr. Lewis**: In other words, *it does not amount to prohibition, but allows of regulation.*

5

**AG Cummings**: That is the idea.  We have studied that very carefully.

Prior to 1986, registered machineguns were involved in so few crimes that the then Director of the BATFE, Stephen E. Higgins, stated during congressional hearings that "machineguns which are involved in crimes are so minimal so as not to be considered a law enforcement problem." Despite no evidence of machineguns having any effect on interstate commerce, Congress banned an entire class of firearms that were rarely, if ever, used in crime, without evidence it would yield to a reduction in crime.

18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun manufactured after May 19, 1986.  The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
> (2) This subsection does not apply with respect to—
>> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

This provision was enacted in 1986 as § 102(9) of the Firearm Owners' Protection Act, which amended the GCA of 1968.  The legislative history of this amendment is, for the most part, nonexistent, except for the mention on the floor by its sponsor, Representative Hughes, when he stated "I do not know why anyone

6

would object to the banning of machine guns." 132 Cong. Rec. H1750 (1986) (statement of Rep. Hughes). While the House vote on the amendment failed, the amendment still made it into the final bill.[1]

The prohibition on machineguns does not apply to all machineguns. Any machinegun lawfully owned before May 19, 1986 may still be transferred or possessed. Accordingly, there are tens of thousands, if not hundreds of thousands, of machineguns lawfully possessed by private individuals and, but for § 922(o), there would likely be hundreds of thousands more lawfully possessed by private individuals. In fact, one of the most popular sporting rifles in existence today, the AR-15 rifle, is merely a semi-automatic version of the M-16 machinegun.

The term "person" is defined in the GCA to mean "any individual, corporation, company, association, firm, partnership, society, or joint stock company." See 18 U.S.C. § 921. The term "person" does not include an unincorporated trust. The BATFE, in an opinion letter dated March 17, 2014 to Dakota Silencer in Sioux Falls, South Dakota, referenced the "person" definition and stated: "[u]nlike individuals, corporations, partnerships, and associations; unincorporated trusts do not fall within the definition of "person" in the GCA." A88-A89. Since, by the BATFE's own admission, the term "person" in the GCA does not include an

---

[1] See Floor Vote on Hughes Amendment:
https://www.youtube.com/watch?v=a6Mx2UcSEvQ

unincorporated trust, such a trust is not subject to the prohibition in § 922(o). While an unincorporated trust falls under the definition of "person" in the NFA, 26 U.S.C. § 7701(a)(1), a trust is not included in the definition of "person" under the GCA. 18 U.S.C. § 921(a)(1). Accordingly, a trust wishing to make a machinegun on a Form 1 is subject to the provisions of the NFA, but is not subject to the GCA's prohibition on possession of post-1986 machineguns.

### B. Factual and Procedural Background

On or about May 23, 2014, Watson, as Trustee of the Watson Family Gun Trust, submitted an application on ATF Form 5320.1 (this form is referred to in the industry as a "Form 1") to make a machinegun. Along with the Form 1, Plaintiff Watson submitted the required $200.00 making tax. This application was submitted in paper form.

On or about June 24, 2014, Watson, as Trustee of the Watson Family Gun Trust, submitted a second application on a Form 1 to make another machinegun, again paying the $200.00 making tax. Unlike the prior application, this application was submitted to the BATFE electronically. On August 5, 2014, the second application was approved by the BATFE to make a machinegun, the stamp was affixed to the Form 1, and the Form 1 was returned to Plaintiff Watson authorizing him to make a machinegun. Shortly after the BATFE approved the second Form 1, a machinegun was manufactured pursuant to that approval. On September 10,

2014, the BATFE emailed Watson stating that the status of his approved Form 1 had been changed from "Approved" to "Dissaproved." The first Form 1 was subsequently returned to Watson with a whited-out signature box, approval box, and date box, and marked "Dissaproved" in two places on the application, clearly evidencing that a change had been made to the Form 1.

On or about October 10, 2014, Watson received a telephone call from the BATFE inquiring about whether a machinegun had been made pursuant to the approved Form 1 and indicated that if it had been, the machinegun must be surrendered to the BATFE. On November 14, 2014, Watson met with BATFE Special Agent Kovach and surrendered his lawfully made machinegun under protest and immediately filed his complaint in the district court.

On July 22, 2015, the district court issued an order granting in part and denying in part the government's Motion to Dismiss or in the Alternative for Summary Judgement. A51-A49. The court held that "Watson satisfies all aspects of standing to challenge the NFA and GCA…" and denied the government's Fed.R.Civ.P. 12(b)(1) motion. A22. The district court applied *Marzzarella's* two-step test for Second Amendment challenges, ending its analysis at the first step, and held that Watson's facial and as-applied challenges fail "…because the Second Amendment does not protect machinegun possession…" A33. The court then dismissed Watson's Due Process claim because "… Watson has no legitimate

claim of entitlement to his Form 1." A43. After holding that Watson had no constitutional right to a machinegun, the court then dismissed Watson's Equal Protection claim. A48.

## SUMMARY OF ARGUMENT

Since the adoption of § 922(o) and the NFA, the United States Supreme Court issued the landmark decision *District of Columbia v. Heller*, 554 U.S. 570 (2008). In that case, the Court held that "ban[s] on handgun possession in the home violate the Second Amendment as does [a] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Heller,* 554 U.S. at 635. Two years after *Heller*, in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Court held that the right to keep and bear arms was a fundamental right, made applicable to the states through the Fourteenth Amendment.

In *Heller,* the Court ruled the "Second Amendment extends prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of founding." *Heller*, 128 S. Ct. at 2817. In order to strike down the ban on handguns, it ruled a complete ban on a protected arm cannot withstand any level of scrutiny. *Id.* This case is analogous and ultimately rises out of the federal government's maintaining a complete ban on the ownership of post-1986 machineguns. Similar to Washington D.C.'s ban on handguns, Defendants' ban on

a complete class of arms cannot withstand constitutional muster. Moreover, even if this ban were to survive constitutional muster if equally applied, Defendants' current application of the law violates the Equal Protection Clause of the United States Constitution.  Likewise, the BATFE's unilateral revocation of an approved Form 1 denies and confiscation of Watson's machinegun violates his Due Process protection.

Additionally, the plain language of § 922(o) mandates a finding that a "trust" is not precluded from making a machinegun.

## REVIEWABILITY AND STANDARD OF REVIEW

A district court's order granting a motion to dismiss is reviewed under a plenary standard. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 206 (3d Cir. 2009). "When considering a Rule 12(b)(6) motion, we are required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir. 2005) (additional citations omitted). "In addition to the complaint itself, the court can review documents attached to the complaint and matters of public record…"  *McTernan v. City of York, Penn.*, 577 F.3d 521, 526 (3d Cir. 2009) (citing *Lum v. Bank of America* 361 F.3d 217, 221 n. 3 (3d Cir.2004)).

11

## **ARGUMENT**

Mr. Watson is a law abiding citizen and a practicing attorney in the Commonwealth of Pennsylvania and the State of New Jersey. Mr. Watson's M-16 at issue is considered a rifle by the military, even though it is referred to as a machinegun under federal law because it fires more than one shot by a single function of the trigger.  This brief will address the M-16 rifle as a machinegun, consistent with federal law.  Mr. Watson makes that distinction to the Court to alleviate any confusion between the terms "rifle" and "machinegun" in this case.

The instant matter brings into question the constitutionality of the Firearm Owners' Protection Act of 1986's ban on the ownership of machineguns found in 18 U.S.C. § 922(o).  It is a decades-old law; one of many now unconstitutional laws passed prior to the United States Supreme Court holding that the Second Amendment confers an individual right to keep and bear arms in *Heller*. This law was passed during a time of uncertainty regarding the nature of the Second Amendment. Now that this uncertainty has passed, this complete ban on the ownership of a type of bearable arm cannot pass constitutional muster. This ban is analogous to the one struck down in *Heller*, and for many of the same reasons it is unconstitutional.

When the United States Supreme Court ruled in the case *District of Columbia v. Heller*, 554 U.S. 570 (2008) that the Second Amendment confers an

individual right to self-defense, it did not overrule *United States v. Miller*, 307 U.S.

174 (1939).[2] *Miller's* core holding is that:

> in the absence of any evidence tending to show that possession or use
> of a 'shotgun having a barrel of less than eighteen inches in length' at
> this time has some reasonable relationship to the preservation or
> efficiency of a well-regulated militia, we cannot say that the Second
> Amendment guarantees the right to keep and bear such an
> instrument…it is not within the judicial notice that this weapon is any
> part of the ordinary military equipment or that its use could contribute
> to the common defense.

*Id* at 177. Accordingly, *Miller* holds that, if evidence is presented or judicial notice

can be taken of whether an item is part of the ordinary military equipment, then it

is protected by the Second Amendment.

In *McDonald v. City of Chicago*, Ill., 130 S. Ct. 3020 (2010), the Supreme

Court held that the Second Amendment confers an individual right by ruling on an

arm; specifically, a handgun. It applied *Heller's* analysis as to arms in finding that

the Second Amendment as a whole has been made applicable to the States.

Accordingly, *Miller's* holding is now applicable to the States.

---

[2] "…the *Heller* plaintiff sought only dispensation to keep an operable firearm in his home for lawful self-defense, see *id.,* at ——, 128 S.Ct., at 2788, and n. 2), and the Court's opinion was bookended by reminders that its holding was limited to that one issue…" *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 885 (2010) (Stevens, J. dissenting).

The Militia Act of 1903, or better known as the Dick Act, was named after former congressman and Senator of Ohio Charles Dick, Chairman of the House Militia Affairs Committee, who also served as President of the National Guard Association of the United States. Charles Dick held the rank of Major General as commander of the Ohio National Guard, reformed the Militia Act of 1792 and created the National Guard distinctly separated into two classes: (1) the uniformed and organized militia under service to the State or Federal governments that receive federal support; and (2) the non-uniformed "unorganized" reserve militia of all able-bodied men between the ages of 18 through 45 or former military veterans or retirees from the Army, Navy, Air Force, Marines, or National Guard or Army Reserve. The Militia Act of 1903 was further modified by several amendments in 1908, and again modified with the National Defense Act of 1916.

The Anti-Federalists feared that Congress would permit the militia to atrophy, leaving the states defenseless against the central government. They argued that the national Congress could render the militia useless by disarming them. Under various pretenses, Congress may neglect to provide for arming and disciplining the militia; the state governments cannot do it, for Congress has an exclusive right to arm them. The desire to prevent enfeebling state militias, which provided a check to a standing army, prompted the ratifying conventions to call for an amendment guaranteeing the right of citizens to bear arms. The First Congress

responded, but the Second Amendment did not remove national control over armed forces or the state militias.  However, the Second Amendment, by saying that the "…Right of the People to keep and bear arms shall not be infringed" and that the Right was a constitutionally protected, individual right, it qualified and defended against U.S. Constitution, Article I, Section 10, Clause 4:  "No State shall, without the consent of Congress … keep troops, or ships of war in time of Peace…." Hence, forthwith, there exists two classes of Militias the "organized" and the "unorganized." (10 U.S.C. § 311(b)).

Both State and Federal governments provide no support to the "unorganized" militia as far as financial, equipment, or arms, with the exception that there is an avenue to voluntarily obtain former military surplus individual arms, i.e. rifle, pistol, bayonet, ammunition, and equipment; formerly through the Civilian Marksmanship Program. Both the President of the United States and the National Congress can call forth the "militia," both organized and unorganized. The "unorganized" militia, on a voluntary basis and through their own financial means, obtain military or "militia" standard rifles, magazines, and ammunition, to practice shooting to gain familiarity, knowledge and competency.

The Federal government and the State government, by banning the "Standard" arms, would diminish, denigrate, and render impotent the efficiency of a reserve pool of the "unorganized" militia, which is every able-bodied male

between the ages of 18 and 45, and, as of 2011's veterans survey, is also composed of 21.5 million veterans of foreign wars who have had first-hand familiarity and knowledge of the M-16 and AR-15, .45 cal. Model 1911 semi-automatic pistol, and the Beretta 9mm, 15-round magazine capacity semi-automatic pistol.  Ever since 1963 and the introduction to the Vietnam war, every single soldier and veteran possesses military experience, tactical knowledge, military leadership and discipline and - quite naturally - in-depth familiarity and knowledge of the M-16, hand-held, shoulder-fired, gas-operated, 30-round individual rifle.

The Second Amendment exists, not as a privilege granted by the Constitution, Federal Government or even State Governments, but it acknowledges the fact that the "right to keep and bear arms" is an individual right and that it is a right that was specifically withheld by the People, who have exercised their individual right to cast one vote as a citizen of the United States.  It is not created for hunting, target-shooting, or other "sporting purposes."  It exists in support of "…That whenever any Form of Government becomes destructive to these ends, it is the Right of the People to alter or abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness…." (Declaration of Independence, Clause 2, July 4, 1776).

As such, one must take into consideration today's environment and militarization of civilian law enforcement.  Local law enforcement is routinely equipped with .50 caliber sniper rifles and "personal defense weapons" to include machine guns (M-16s with 30 round magazines and semi-automatic handguns with standard capacity 15 round magazines).  This "load-out" is routine, either when serving simple warrants or court-ordered subpoenas or an office search with a fully armed SWAT or Hostage Rescue Team.[3]

The Second Amendment ensures that there is equality on an individual basis with the "organized" militia, in preparation for one-on-one conflicts or violent confrontations, limited to land war. The Federal and State governments have no authority to subordinate the individual firearms of the "unorganized" militia or to limit magazine content and lesser quality or inferior ammunition.  Nor can the Federal or State governments single out and subject constitutionally protected firearms, magazines, and ammunition to excessive and punitive taxes, insurances, or over burdensome qualifying factors to exercise such protected rights.  Simply being a citizen of the United States and acknowledgement that the Second Amendment exists is sufficient.

---

[3] Even the Department of Agriculture arms itself with machineguns. https://www.fbo.gov/index?s=opportunity&mode=form&id=9fc3a01217d03b0354e1e18b69aa7bad&tab=core&_cview=0 (last accessed November 29, 2015).

## I.    THE CHALLENGED LAWS ARE UNCONSTITUTIONAL FACIALLY AND AS-APPLIED TO WATSON

### A. <u>The Challenged Laws Burden Second Amendment Rights</u>

#### i.  Defendants Misapply *Heller's* Dangerous and Unusual Language

As set forth below, the dangerous and unusual doctrine does not pertain to the mere *possession* of a firearm (or other weapon), but only applies to the *manner* in which that right is exercised.  This case is not about the *carrying* of "dangerous and unusual weapons", but mere possession of a firearm.  Justice Scalia clarified this recently: "For example, there was a tort called affrighting, which if you carried around a really horrible weapon just to scare people, like a head ax or something that was, I believe, a misdemeanor," he explained.[4]

Justice Scalia's comments likely stem from A Treatise on the Criminal Law of the United States by Francis Whartson (1874)

> An affray, as has been noticed, is the fighting of two or more persons in some public place, to the terror of the citizens. (footnote omitted) There is a difference between a sudden affray and a sudden attack. An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. (footnote omitted). ... yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself

---

[4] *See* http://cnsnews.com/news/article/justice-scalia-2nd-amendment-limitations-it-will-have-be-decided (last visited 12/1/2015).  Justice Scalia further stated, "I mean, obviously, the (2nd) amendment does not apply to arms that cannot be hand-carried. It's to 'keep and bear.' So, it doesn't apply to cannons. But I suppose there are hand-held rocket launchers that can bring down airplanes that will have to be -- it will have to be decided."

with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute. *Id.* at 527.

In this context, the Common Law's definition of "dangerous" was any item that could be used to take human life through physical force. ("[S]howing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life … is … the use of dangerous weapons" *United States v. Hare*, 26 F. Cas. 148, 163 - 64 (C.C.D. Md.1818)). "Any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt" *See Baron Snigge v. Shirton* 79 E.R. 173 (1607). In this context, "unusual" meant to use a protected arm in a manner which creates an affray. Timothy Cunningham's 1789 law dictionary defines an affray as "to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror." An unusual use of weapons in common use led to *Baron Snigge v. Shirton* 79 E.R. 173 (1607), this case involved a landlord - lessee dispute. The tenant "kept the possession [of the house] with drum, guns, and halberts". The Court found he used "unusual weapons" to maintain possession of the house. *Id. Rex v. Rowland Phillips* 98 E.R. (1385) holds "if an officer in the impress service, fire in the usual manner at the hallyaras of a boat, in order to bring her to, and happen to kill a man it is only manslaughter". *Id.*

The "dangerous and unusual" doctrine is not merely a restatement of *Heller*'s tests for protected arms. *Heller* offered that its test for what arms are protected by the Second Amendment is "supported by" the prohibition on the carriage of dangerous and unusual weapons, *Heller*, 554 U.S. at 627 (citations omitted), but that is not to say the two concepts—the scope of the arms protected by the Second Amendment, and the "dangerous and unusual" doctrine—are identical. They are very different.

As the sources *Heller* cited indicate, the longstanding prohibition on the carrying of "dangerous and unusual weapons" does not, in fact, refer to types of weapons, but to types of conduct with weapons. A necessary element of this common law crime of affray, to which the "dangerous and unusual" prohibition refers, had always required that the arms be used or carried in such manner as to terrorize the population, rather than in the manner suitable for ordinary self-defense.

*Heller*'s first source on the topic, Blackstone, offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, English courts had long limited to prohibit the

carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789, 795 (1982) (citing *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of an intention to commit an[ ] act of violence or disturbance of the peace." TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s additional citations regarding the "dangerous and unusual" doctrine are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." James Wilson, WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … But

> here it should be remembered, that in this country the constitution guar[]anties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also Heller*, at 588 n.10 (quoting same). It is the *manner* of how the right is exercised, not the type of weapon that is carried that constitutes the crime. At no point is a test referred to regarding the commonality of the usage of the weapons carried. Said another way, just because a firearm or other weapon is in common usage at the time does not make the *manner* in which the right is exercised excused or excusable simply due to the type of firearm or weapon carried.

"[T]here may be an affray … where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons . . . in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id*. at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill v. State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State v. Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English v. State*, 35 Tex. 473, 476 (1871) (affray "by terrifying the good people of the land"). In fact, one does not even need to be armed with a firearm to commit the crime of affray under the dangerous and unusual doctrine. *See State v. Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed).

As *Heller* summarized, the traditional right to arms "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller* at 626. Thus carrying of dangerous and unusual weapons refers to a time, place, and manner restriction on the carrying of protected arms. As Watson's challenge is about mere possession of a machinegun, and not carrying, the dangerous and unusual doctrine simply does not apply. Accordingly, we are

Case: 15-2859    Document: 003112144710    Page: 32    Date Filed: 12/02/2015

left with the proposition that Watson's machinegun is a protected arm. Hence we must determine the constitutionality of government's prohibition on this arm.

### ii. Defendants Complete Ban on Machineguns is Categorically Invalid

In *Heller*, applying heightened scrutiny was unnecessary. The Court found, no matter what standard of review to which the Court might have held the D.C. restrictions, "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id*. at 628–629 (internal quotation marks and citation omitted). A law effecting a "destruction of the right," rather than merely burdening it, is, after all, an infringement under any light. *Heller* at 629 (emphasis added) (quoting *Reid*, 1 Ala. at 616–17); *see also Heller v. D.C., 670 F.3d 1244, 1271 (D.C. Cir. 2011)* (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.").

This matter is analogous. Here, the government completely bans a class of bearable firearms. Watson concedes that the ownership of machineguns can be regulated to a point, just as all firearms are regulated. However this complete ban can fulfill no level of scrutiny. *See Heller* 628–35. "[C]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them...." *Id*. at 634-635. (A law that "under the pretense of regulating, amounts to

a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional"). However, if this Court rejects the approach applied by *Heller* then, at a minimum, strict scrutiny should apply.

### iii. *U.S. v. Marzzarella* Supports Applying a Categorical Approach

*U.S. v. Marzzarella,* 614 F.3d 85, 97 (3d Cir. 2010) supports applying a categorical approach to this complete ban on a class of arms. The defendants in *Marzzarella* argued that the Court should apply a categorical approach finding the ban on firearms with obliterated serial numbers unconstitutional. The Court found this argument unpersuasive:

> His argument rests on the conception of unmarked firearms as a constitutionally recognized class of firearms, in much the same way handguns constitute a class of firearms. That premise is unavailing. *Heller* cautions against using such a historically fact-bound approach when defining the types of weapons within the scope of the right. 128 S.Ct. at 2791 ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way"). Moreover, Marzzarella himself asserts that serial numbers on firearms did not exist at the time of ratification. Accordingly, they would not be within the contemplation of the pre-existing right codified by the Second Amendment. It would make little sense to categorically protect a class of weapons bearing a certain characteristic when, at the time of ratification, citizens had no concept of that characteristic or how it fit within the right to bear arms.

> Furthermore, it also would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility. *Heller* distinguished handguns from other classes of

firearms, such as long guns, by looking to their functionality. *Id.* at 2818 (citing handguns' ease in storage, access, and use in case of confrontation). But unmarked firearms are functionally no different from marked firearms. The mere fact that some firearms possess a nonfunctional characteristic should not create a categorically protected class of firearms on the basis of that characteristic. *Marzzarella* at 93-94.

Clearly, *Marzzarella* supports applying a categorical approach on bans on arms functionally different from a handgun. Such is the case here. Watson's automatic M-16 is considerably different in form and function than a handgun. As established above, it is a protected arm.    Accordingly, the government's complete ban on these protected arms should be deemed categorically invalid. However, if any level of scrutiny need apply, then strict scrutiny must apply.

### iv.    The 1934 Hearing on National Firearms Act Supports That A Categorical Ban Would Be Unconstitutional

Unlike the machinegun ban in § 922(o), the constitutionality of the original NFA bill was actually debated, with then-Attorney General Homer Cummings admitting that a ban on machineguns may not survive Constitutional scrutiny unless reached through Congress' power to tax.    Cummings denied that machineguns could be banned, because "we have no inherent police power to go into certain localities and deal with local crime.  It is only when we can reach those things under the interstate commerce provision, or under the use of the mails, or by the power of taxation, that we can act."

While Congress may have the power to regulate under the auspices of a tax, § 922(o) goes beyond that and is treated as a categorical ban on a bearable arm. Even in 1934, Congress understood (and the Attorney General conceded) there may be a constitutional issue with a categorical ban.

### v.    The Ban on Machineguns in § 922(o) is not Longstanding or Presumptively Lawful

Defendants stated that the restrictions on possession of a machinegun are longstanding and presumptively lawful.[5]  The federal ban on machineguns, as stated *supra*, is not a longstanding law, as it became law only in 1986.  And *Heller*, not a case about machineguns, did not stand for the proposition that the ban is presumptively lawful.

The government cited to a number of cases regarding machineguns being regulated at the state level, so that must mean that the ban on machineguns is longstanding.  But that demonstrates nothing other than states regulate firearms. The federal ban is the statute being considered and that the states regulate or regulated machineguns is a matter for another time.  What matters is that Pennsylvania does not prohibit machineguns, as long as they are properly registered per federal law, and Watson would be able to manufacture a

---

[5] As shown below, *Heller* does not hold longstanding doctrines are presumptively lawful, however, even if it did, the federal ban on machineguns, discussed *supra,* is not a longstanding law as it only became law in 1986.

27

machinegun, pursuant to federal law, if Defendants were not prohibiting him from doing so.  If it mattered that machineguns were subject to longstanding regulations, the D.C. gun ban would likewise have been classified a "longstanding law," forbidding residents from keeping and bearing arms in the home, and thus the *Heller* court would have found in D.C.'s favor.  But as we know, D.C.'s categorical ban did not survive, no matter how long it had been in effect.

While the Fifth Circuit has held that the "unlawful possession of a machine gun is a crime of violence" under the Sentencing Guidelines (*see U.S. v. Golding*, 332 F.3d 838, 839 (5th Cir. 2003)) and has affirmed convictions for the unlawful possession (i.e., not in compliance with the NFA) of a machinegun (*see U.S. v. Kirk*, 105 F.3d 997, 998 (5th Cir. 1997)), those cases are easily distinguishable as those cases dealt with a *felon* in possession and an *unregistered* machinegun, respectively.  In fact, most of the cases dealing with machineguns are those entwined in criminal prosecutions, not remotely close to Watson, who applied for and received permission from the BATFE to build his machinegun.  Cases regarding *criminal* behavior are simply not applicable to the case at hand, as Watson is not prohibited from owning firearms.

When *Heller* refers to certain longstanding prohibitions surviving, it is not giving a temporal test. It simply is providing examples of existing firearms laws

which are constitutional post-*Heller*. It is a misreading of *Heller* to argue all long standing prohibitions are presumptively constitutional.  *Heller* states:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller* at 626-27.  This passage is simply to give assurances that reasonable regulations would continue to be constitutional post-*Heller*. This is evidenced by *Heller* referencing both modern restrictions such as those on commercial sales and historical restrictions on Common law felons and the mentally ill. Moreover, a natural reading of this passage supports that these are simply examples of restrictions that survive constitutional muster. While *Heller* teaches us that text and history are essential to analyzing the scope and nature of the Second Amendment right, Defendants' position finds no support in *Heller*.

**vi.    If Means-End Scrutiny is Necessary, Strict Scrutiny Should Be Applied**

This court applies the familiar two-step analysis pursuant to *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  Accordingly, if the Second Amendment right is implicated at all, the presiding Court must apply (at the very least) some form of means end scrutiny.  Here, the complete ban on a protected

class of arms should trigger a categorical approach. However, if means-end scrutiny applies, then this Court should adopt the Sixth Circuit's recent approach.

While the Sixth Circuit's opinion was vacated and rehearing *en banc* granted, that court recently stated that: "*Heller*'s footnote 27—even aside from the Court's flat rejection of Justice Breyer's interest-balancing inquiry—strongly suggests that intermediate scrutiny 'could not be used to evaluate' Second Amendment challenges." *Tyler v. Hillsdale County Sheriff's Dept.,* 775 F.3d 308, 328 (6th Cir. 2014), reh'g en banc granted, opinion vacated (Apr. 21, 2015). Under strict scrutiny, a challenged law will satisfy scrutiny "if it furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Commn.,* 558 U.S. 310, 312 (2010). Section 922(o) furthers no compelling interest, or if it does, is not narrowly tailored, as it is a categorical ban on machineguns.

We turn back to the two-pronged approach in *Marzzarella*. First, the court must "ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). If the conduct is not burdened, then the court's inquiry is complete. However, if the conduct is burdened, the court "evaluate[s] the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Marzzarella*, 614 F.3d at 89.

The court's first inquiry is whether 18 U.S.C. § 922(o) regulates conduct within the scope of the Second Amendment. The first prong is not difficult to answer in the affirmative; § 922(o) regulates conduct within the Second Amendment. As stated in *Heller*, "… the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582. The Second Amendment does not only protect "those arms in existence in the 18th century." *Id*. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id*. at 634.

18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun manufactured after May 19, 1986. This provision was enacted in 1986 as § 102(9) of the Firearm Owners' Protection Act, which amended the GCA of 1968. Further, the term "person" is defined in the GCA to mean "any individual, corporation, company, association, firm, partnership, society, or joint stock company." *See* 18 U.S.C. § 921. The statutory definition of the term "person" does not include an unincorporated trust. As the plain language excludes "unincorporated trust" from the definition, this Court (and the BATFE) should not read into the statute what is not there. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 14-2767, 2014 WL 7172253, at *6 (3d Cir. Dec. 17, 2014) (citing

31

*Meese v. Keene,* 481 U.S. 465, 484, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term.").

Defendants, mindful of the definition of the term "person," stated in an opinion letter on March 17, 2014 to Dakota Silencer in Sioux Falls, South Dakota, referenced the "person" definition and stated: "[u]nlike individuals, corporations, partnerships, and associations; unincorporated trusts do not fall within the definition of "person" in the GCA." A88-A89.  By the BATFE's admission, the term "person" in the GCA does not include an unincorporated trust and such a trust cannot be subject to the prohibition in § 922(o).

But delving further into the constitutionality of § 922(o), *Heller* does not stand for the proposition that the types of firearms at issue in this case are not protected by the Second Amendment, only that it would be a "startling reading of the [*Miller*] opinion since it would mean that the NFA's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* at 624.  (*See U.S. v. Miller*, 307 U.S. 174 (1939) (Absence of evidence showing that short-barreled shotguns have reasonable relationship to preservation or efficiency of well-regulated militia, Court cannot say Second Amendment protects such a firearm).  It is also important to note the Supreme Court's "startling" language was directed at the NFA, <u>not</u> the GCA,

which encompasses the categorical ban on post-May 19, 1986 machineguns. The NFA places restrictions on machineguns by taxing them and making the possessor file certain paperwork. The GCA, 18 U.S.C. § 922(o), is the provision that bans possession by "persons" for any machinegun not lawfully possessed prior to its enactment.

Section 922(o) is simply overbroad, as it bans <u>all</u> machineguns; machineguns that are protected by the Second Amendment as bearable arms and machineguns that are not bearable arms. But reading *Miller* and *Heller* together, clearly an M-16 (under *Miller*) has "some reasonable relationship to the preservation or efficiency of a well-regulated militia" as every branch of the armed forces (and multitude of federal and state agencies) utilizes the M-16 for some purpose. *Miller*, 307 U.S. at 178. Thus, Watson's desire to own one falls within Second Amendment protection. Accordingly the question is what level of constitutional scrutiny is to be applied.

The machinegun in this case, an AR15 which was converted into an M-16 (after payment of the mandated tax and approval under the authority of the government, in this case, the BATFE) is a bearable arm. This is not to say that all machineguns are protected under *Heller*, as the machinegun under current Supreme Court precedent would first have to be a "bearable arm," and arguably machineguns which are crew-served would fall outside of that protection. But it

cannot be questioned that an M-16 would fall under the "bearable arms" protection of *Heller*. As such, it is protected.

Under the second prong, the court will "then proceed[ ] to apply the appropriate level of means-end scrutiny." *Marzzarella,* 614 F.3d at 89. The level of scrutiny that is appropriate "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right. *See Chester*, 628 F.3d at 682 (observing that a 'severe burden on the core Second Amendment right of armed self-defense should require a strong justification,' but 'less severe burdens on the right' and 'laws that do not implicate the central self-defense concern of the Second Amendment[ ] may be more easily justified' (quotation and citation omitted))." *Id*. at 195. The intermediate scrutiny test cannot be a rational basis review as *Heller* forbids a rational basis application to evaluate an "enumerated right." *Id*. If intermediate scrutiny applies, the government must demonstrate a "reasonable fit between the challenged regulation and an important government objective." *Id*. (internal quotations and additional citations omitted).

The ban contained in § 922(o) is a complete ban on the possession of post-May 19, 1986 machineguns. All of them. The ban discriminates not on bearable arms or crew served machineguns. If the firearm fires more than one shot with a single function of the trigger, then it is classified as a machinegun. The burden

imposed by § 922(o) severely limits the possession of a protected class of firearms. Substituting machineguns for handguns, it is not difficult to make the leap that § 922(o) does "not just regulate possession of [a machinegun]; it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home." *U.S. v. Marzzarella,* 614 F.3d 85, 97 (3d Cir. 2010) (citing *Heller*, 128 S. Ct. at 2818). Thus strict scrutiny must apply.

However, under any means-end scrutiny, Defendants have failed their burden in showing a compelling or important government interest in banning machineguns as applied to Watson. Defendants cannot, in fact, demonstrate any government interest at all, or if they can demonstrate *an* interest, it is not a *compelling* interest. If the Defendants were serious about banning machineguns, then they would attempt to simply ban them. But Defendants instead ban machineguns solely based upon date of manufacture, even though the NFA already regulates the ownership, possession, and transfer of <u>all</u> machineguns. Section 922(o) simply goes too far.

### vii.    Even if Means-End Scrutiny Applies, Defendants Fail Their Burden

Here, the burden is on the government to show that their complete ban on machineguns meets the requisite level of scrutiny. As the government did not address a strict scrutiny analysis in the district court, they presumably concede that, if the Court applies strict scrutiny, then their complete ban on a protected arm is

unconstitutional. In order to fulfill strict scrutiny, the government must show that there is compelling governmental interest and that the restriction is narrowly tailored and is the least restrictive means. *See Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981).

Here, protecting public safety and combating crime is what Defendants offer as their interest in regulating machineguns. However, a complete ban is not in any way, shape, or form narrowly tailored and it is certainly not the least restrictive means to achieve this government interest. Defendants could simply regulate their use, such as requiring strict registration, background checks, and otherwise making it possible for Watson and other law abiding citizens to own automatic firearms while not allowing the criminal element to purchase or possess them. The BATFE does this already within the purview of the already onerous NFA. The ban goes one step further than necessary and eliminates possession to any non-governmental entity for post-May 19, 1986 machineguns.

However, even if this Court finds intermediate scrutiny is proper, Defendants complete ban on these protected arms still fails. Why? Defendants have not actually shown that lawfully owned machineguns are actually linked to crime. Under intermediate scrutiny, "the government has the burden of demonstrating that its objective is an important one and that its objective is

36

advanced by means substantially related to that objective." *United States v. Reese*, 627 F.3d 792, 802 (10th Cir.2010).

Defendant bears the burden of proving a "reasonable fit" or a "substantial relationship" between the ban and a "significant, substantial, or important" government objective. *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir.2013) (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010)). This requires a demonstration that the law is likely to advance that interest "to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).

The government's "burden is not satisfied by mere speculation or conjecture"; instead, it "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (emphasis added). Defendants must prove with "substantial evidence" that the statute "will alleviate" the identified harm "in a material way." *Turner Broad. Sys. v. F.C.C.*, 520 U.S. 180, 195 (1997) (*Turner II*); *Edenfield*, 507 U.S. at 770-71 ("will in fact alleviate them to a material degree").

While machineguns certainly can be dangerous weapons (as can be cars, knives, and even matches to an arsonist), no evidence was presented that, even if available, they are the weapon of choice for criminals. That is because Appellees cannot produce that evidence. The weapon of choice for criminals are cheap handguns that can be disposed of easily, not $10,000.00 machineguns that are

worth more than any convenience store register could possibly have. Thus, applying <u>any</u> level of heightened scrutiny; Appellees' complete ban fails.

Specifically, with regard to crime, as Defendants repeatedly point to government's *compelling* interest in protecting public safety and combating crime, if we look at the actual statistics and congressional testimony, they do not demonstrate the parade of horribles posited exists. In fact, in 1984 at a hearing before Congress, then-Director Stephen E. Higgins testified about the NFA and <u>lawfully registered machineguns</u> specifically. Director Higgins stated,

> These weapons are held by collectors and others; only rarely do they figure in violent crime. In this connection, the question of why an individual would want to possess a machinegun or, more often, a silencer, is often raised. We would suggest that ATF's interest is not in determining why a law-abiding individual wishes to possess a certain firearm or device, but rather in ensuring that such objects are not criminally misused. <u>The regulatory scheme for dealing in or legally possessing NFA weapons and silencers is straightforward and provides safeguards which are adequate, in normal circumstance, to ensure that the firearms remain in the hands of law abiding individuals.</u>

*Armor Piercing Ammunition and the Criminal Misuse of and Availability of Machineguns and Silencers: Hearings on H.R. 641 and Related bills Before the Committee on the Judiciary, 98th Congress, 1st Sess. 132* (1984). (underlining added). Further, Director Higgins testified that "registered machineguns which are involved in crimes are so minimal so as not to be considered a law enforcement problem." *Id*.

Director Higgins testified that, as of September 30, 1984, there were 105,125 registered machineguns with 20,499 registered to governmental entities (law enforcement agencies and the like), 41,419 registered to Special Occupational Taxpayers (dealers and manufacturers), and 43,207 registered to individuals. Adding together the "private" owners, dealers and individuals; 84,626 of those machineguns did not belong to a governmental entity, or approximately 80.5% of registered machineguns were in private hands.

The statistics from the Bureau of Justice Statistics ("BJS"), a U.S. Department of Justice, Office of Justice Program, tell the same tale. In the Highlights section of the 1995 Firearms, crime and criminal justice report by Marianne W. Zawitz, BJS Statistician, it states "Although most crime is not committed with guns, most gun crime is committed with *handguns*." (italics added).[6] The report states that "Of all firearm-related crime reported to the survey, 86% involved handguns," and that 57% of all murders in 1993 were committed with handguns, 3% with rifles, 5% with shotguns and 5% where the type was unknown.[7] With regard to machineguns, the report states that in 1995, the BATFE

_____

[6] Docket 13-5, p.1 (Unless otherwise specified, all docket citations are to Case No. 2:14-cv-06569-SD).

[7] *Id*. at p. 3.

had 240,000 automatic weapons registered.[8]  However, the number of "trace requests," (meaning when a firearm is used in a crime and a police agency requests the National Tracing Center at the BATFE to trace the original point of sale) for machineguns barely registered on the report.  In 1994, handguns constituted 79.1% of all trace requests; Rifles 11.1%; Shotguns 9.7%; and "Other including machinegun" 0.1%.  Out of the ten most frequently traced firearms in 1994, (a mere eight years after the ban) not surprisingly, machineguns do not appear.  In fact, nine out of those ten are pistols, with the majority of those pistols being inexpensive handguns, commonly referred to as "Saturday night specials."[9]

In May 2013, another report from the BJS regarding Firearm Violence from 1993-2011 shows the government's position regarding machinegun crime or public safety is untenable.  The report's findings show that handguns account for "about 83% of all firearm homicides in 1994, compared to 73% in 2011…. For nonfatal firearm violence, about 9 in 10 were committed with a handgun…"[10]  In 2011, there were 11,101 firearm homicides, down from 18,253 in 1993.[11]  Compare that with 38,023 deaths related to motor vehicle accidents; 27,483 deaths due to falls,

---

[8] *Id*. at p.5.

[9] *Id*. at p.6.

[10] Docket 13-4, p. 4.

[11] *Id*. at p. 1.

43,544 deaths related to drugs; and 26,654 deaths related to alcohol.[12] Yet vehicles and alcohol are not banned.

Assuming *arguendo* that public safety and/or the prevention of crime was a serious contention for the banning of an entire category of weapons, handguns would not have been allowed or specifically protected under *Heller*. This bears repeating. Despite the majority of homicide and firearms crime being committed with handguns, the *Heller* court protected that category of firearm. *See Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012) (the "mere possibility" that a gun control law may save lives is not enough or "*Heller* would have been decided the other way" if it were).

Yet, even if we ignored the government's own statistics, the Supreme Court has rejected the notion that arms bans for the law-abiding are justified to prevent unlawful use by criminals. *Heller* at 636; *McCullen v. Coakley, Id.* at 712 (Breyer, J., dissenting) (arguing that lawfully-owned handguns could be stolen by criminals); *cf. Fotoudis v. Honolulu*, 2014 WL 4662385 at *5 (D. Haw. 2014) (prohibition of gun ownership by lawful permanent resident aliens is not "narrowly tailored," because it applies "regardless of whether they are otherwise qualified to acquire firearms, and regardless of whether they might pose a threat to others").

---

[12] http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_03.pdf, table 13.

And there is no argument that Watson is a prohibited person or would be dangerous with a machinegun.

### viii.    Defendants Misread *United States v. Miller*

Defendants misread the holding of *United States v. Miller*, 307 U.S. 174 (1939) and argue it holds short-barrel shotguns are not protected by the Second Amendment. *Miller* holds that

> …in the absence of any evidence tending to show that a possession or use of 'a shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or the efficiency of a well-regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within the judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id.*

For background on *Miller*, Jack Miller and Frank Layton were accused of transporting a double-barrel, a Stevens Shotgun, with a barrel length of less than 18 inches, without registering it and paying a $200.00 tax; a violation of the NFA. Jack Miller, Frank Layton, and their representative attorney-at-law did not appear in court for the hearing. The trial court found the NFA violated the Second Amendment's right to keep and bear arms and ultimately dismissed the government's case. The government then appealed to the Supreme Court. Interestingly, neither Miller nor his counsel filed any briefing with the Court nor did they appear. As such, the Court ruled as it did and remanded the case to the

lower Court for further proceedings consistent with its opinion. Unfortunately, this did not occur, as both Miller and Layton died shortly after the Court's decision.

*Heller* relies on *Miller* for the historical fact that when militia men "were called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." While this historical fact has been misinterpreted as a test, *Miller* cites this historical fact solely to support its holding. The Court provided one example of how something can aid in the preservation or the efficiency of a well-regulated militia. That is to show something is "part of the ordinary soldier's equipment." *Heller* expands on *Miller* to hold handguns (and other arms) designed for personal self-defense receive Second Amendment protection regardless of whether they have military value.

Defendants argue that the Second Amendment right does not foreclose "categorical legislative prohibitions [as] … the right protected by the Second Amendment is a right to 'keep and bear Arms,' not a right to possess a specific firearm or type of firearm." This argument borders on the frivolous as it was explicitly rejected in *Heller*. "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller* at 629. The Supreme Court rejected the argument that a ban on handguns is constitutional as long as long arms are legal to own. Further, Defendants' reference to the Militia Acts is unpersuasive. Watson

43

has no duty to standardize his small arms collection for mandatory military training, nor were members of colonial militias limited to owning weapons authorized for militia duty. However, Defendants' concession that arms tied to militia duty are part of the historical right supports finding an M-16 is protected by the Second Amendment.

Defendants argue that bearable machineguns are not needed for personal self-defense. This fails to acknowledge there are millions of veterans who are most comfortable defending themselves with this arm due to training received in the armed forces. However, even if Defendants' argument was valid, the M-16 machinegun receives Second Amendment protection on independent grounds as it is the standard issue weapon of the ordinary soldier. As such, it is the quintessential militia arm. Accordingly, just as colonial Americans had a fundamental right to own and familiarize themselves with the rifles which constituted the militia arms of the time, Watson has a fundamental right own his modern day equivalent which is the M-16 rifle for the Defense of himself and the State.

### ix. *Miller* Provides the Outer Limits for the Second Amendment Right

This Court may have legitimate concerns that a ruling in Watson's favor will open the floodgates to legalizing deadlier bearable weapons, such as surface-to-air missiles. This Court should be assured that it will not. *Heller*'s ruling that the

Second Amendment right extends *prima facie* to all bearable arms should be read in tandem with *Miller*'s holding that the Second Amendment right extends to items that are part of the ordinary soldier's equipment. Watson's M-16 rifle clearly falls within the scope of the military equipment issued to the average infantry soldier. Moreover, they are bearable upon the person. Thus, M-16s fall within Second Amendment protection in lock step with the framework established by *Heller* and *Miller*. Arms such as shoulder-fired rockets, mortars, and heavy machineguns probably do not. Either the aforementioned weapons require a crew of two or more, *or* they are not part of the ordinary soldier's equipment.

The M-16 is the quintessential militia-styled arm for the modern day. Since the Founding of Jamestown in 1607, the militia firearm has evolved from the following:

- Muzzleloader – Musket.
- Manual breach load – rifle or pistol.
- Clip load (normally five rounds on an inline clip) deposited into a built in magazine located in the mechanics of the firearm.
- Detachable Box-magazine from the firearm usually holding 5, 10,15,20,30 rounds.
- Detachable Drum-type magazine holding up to 100 rounds.
- Belt-fed ammunition expending indefinite number of rounds.

The M-16 service rifle is the standard issue firearm for all branches of the military. Since 1965 and the introduction of the M-16 rifle, from conscription draft days to the modern volunteer armed forces, every single man and woman has been trained and possesses knowledge and experience with the firearms, and is familiar with the

45

maintenance and care and repair of the firearm. The advantage to owning and training with the standard military weapon is the shortness of time to re-familiarize returning personnel back to active duty; assisting in instructing new and unfamiliar personnel; standardizing the ammunition and maintenance tools; and to lessen the burden of the State and Federal government to resupply the returning forces with arms and ammunition. Accordingly, Watson's M-16 fulfills the *Miller* test of aiding in the preservation or the efficacy of the militia and *Heller*'s bearable on the person requirements for Second Amendment protection.

### x.    "Common Use" Is the Output of the *Miller* Test

*Heller* holds;

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Heller*, 554 U.S. at 627.

Heller's discussion of arms in common use is not ordering the lower courts to engage in a numerical count of a particular weapon type to determine whether it is protected by the Second Amendment. This is an invitation by the Court to review its earlier decision in *Miller* alongside *Heller* in order to determine whether an arm is protected by the Second Amendment. In *Miller* the Court ruled only arms that aid in the preservation or the efficacy of the militia are protected. Based on *Heller,*

46

we know that aiding with personal self-defense fulfills that test. *Miller* established that being part of the ordinary soldier's equipment is another way to fulfill that test.

The fact that weapons which fulfill this test are protected is fairly supported by the tradition of prohibiting carrying dangerous and unusual weapons. The antecedent of this argument holds true as well. There are weapons that are outside of the militia right. Weapons such as surface to air missiles are neither part of the ordinary soldier's equipment nor useful for personal self-defense. Therefore, they are not weapons in common use. Hence, not only is it lawful to ban their ownership, their carry is not implicated via the dangerous and unusual doctrine at all. Rather their carry can be banned without a government interest shown. This is because these arms are presumably outside the scope of the Second Amendment right. Accordingly, *Heller*'s common use language is an order by the Court to refer to its previous decision in *Miller* and to history in order to determine the scope of the Second Amendment right.

That weapons in common use are protected is supported by the tradition of prohibiting carrying dangerous and unusual weapons. This is because this tradition only refers to regulation on the carrying of protected arms and armor. At Common Law, subjects had a general right to carry protected arms as these arms were protected by our Common Law right to defense. If an arm was protected, English and early American governments could not strip the right to carry it without cause.

Rather they had to establish conduct with a dangerous weapon was unusual to prohibit it. For example, walking down to the market in full plate with a head axe could be prohibited because this conduct disturbed the peace or "terrified" normal citizens.

Similarly, in modern days, carrying a rifle dressed in SWAT gear can be constitutionally prohibited in a residential area because this behavior is unusual and disturbs the peace or "terrifies". However, once these arms are determined to be protected, the burden is on the government to show why particular conduct can be prohibited. Shifting the burden to the government fairly supports that certain arms are protected. With arms that were not protected, the government can restrict carry without any interest shown. The tradition of prohibiting dangerous and unusual <u>carry</u> of arms in common use supports the fact one had a historical right to <u>own</u> protected arms at Common Law. The carry of unprotected arms can be banned with no government interest shown because these arms receive no constitutional protection. Thus, there was no need to apply the dangerous and unusual doctrine. As shown, the tradition of prohibiting carrying dangerous and unusual weapons fairly supports that weapons in common use are protected. And a faithful reading of *Heller* supports that the weapons in common use are those that survive the *Miller* test.

48

While this Court is not bound by a Wisconsin Court of Appeals case, the following is instructive. In *State v. Herrmann*, 2015AP53-CR, 2015 WL 7432597 (Wis. App. Nov. 24, 2015), Herrmann was convicted of keeping an automatic knife (a switchblade) in his home for self-defense. Wisconsin (and Pennsylvania) bans possession of automatic knives. Wisconsin argued the same as the state always argues: protecting the public. Yet in *Herrmann*, just as the Appellees here, the state cited

> no evidence to establish that [attacks with switchblades] actually exists to any significant degree. Again, the State has the burden to establish that § 941.24(1) satisfies intermediate scrutiny, and it must do so by showing the existence of real, not merely conjectural, harm. See *Turner Broad. Sys.*, 512 U.S. at 664.

*State v. Herrmann*, 2015AP53-CR, 2015 WL 7432597, ¶12. Sharing the same rationale as the tradition of prohibiting carrying dangerous and unusual weapons, the court further stated:

> Moreover, as applied to Herrmann, Wis. Stat. § 941.24(1) is not substantially related to the State's cited objective of protecting the public from surprise attacks. It is undisputed that Herrmann possessed his switchblade in his own home for his protection. The threat to the public of a surprise attack by a person possessing a switchblade in his or her own residence for the purpose of self-defense is negligible. Consequently, while banning possession of switch-blades in other settings might be substantially related to the State's cited objective of protecting the public from surprise attacks, prohibiting individuals from possessing switchblades in their own homes for their own protection is not.

*Id*. at ¶13. Further, in Fn. 9 of the opinion, the Herrmann court stated:

49

Although the *Heller* Court emphasized that handguns are frequently used for self-defense, we do not think *Heller* can be read to create different levels of protection for different types of arms that fall under the Second Amendment, <u>based on their popularity</u>. In addition, it is not particularly surprising that handguns are more prevalent than switchblades, given that switchblades were banned or severely restricted in many states, including Wisconsin, beginning in the late 1950s and early 1960s.

*Id.* at Fn. 9. This is directly analogous to Watson and his M-16. While the government may have an interest in prohibiting the <u>carry</u> of an M-16, certainly Watson cannot be prohibited from mere possession in his own home for his own protection of a firearm that he registered (and was approved by the BATFE) pursuant to the NFA and further, the "popularity" of said arm cannot provide the basis for the protection.

## II.    BY ITS CLEAR LANGUAGE, THE GUN CONTROL ACT DOES NOT APPLY TO THE WATSON FAMILY GUN TRUST

### a.  The Watson Family Gun Trust Machinegun Transaction is Exempt From the NICS Check.

For many years, Americans have commonly placed rare and expensive NFA firearms into family trusts. In such cases, the trust is the entity which applies to obtain the NFA weapon. In processing that application, the FBI could not run a background check on the trust because, unlike a human being, a trust does not have a photograph, fingerprints, or a criminal record. See 27 C.F.R. § 479.85; see also 78 Fed. Reg. 55016. Once the trust application was approved, any eligible trustee

or trust representative could take possession of the weapon, exempt from the NICS background check under 18 U.S.C. § 922(t)(3)(B).

In 2013, BATFE changed its regulatory policy, proposing the adoption of a new rule[13] which BATFE has set in motion to be final.[14]  BATFE asserted that there "has been an increase in the number of individuals who have access to NFA firearms but who have not undergone a background check."  78 Fed. Reg. 55016. Thus, ATF's new-rule would, *sua sponte*, require the identification of a "responsible person," acting "on behalf of [a] legal entity" (such as a trust) before taking possession of an NFA- approved weapon. Pursuant to this new regulation, the person taking possession of the weapon would be required to submit to a NICS check. *Id*.

In creating this new requirement, BATFE has conveniently overlooked the plain language of 18 U.S.C. § 922(t)(1), which states that the NICS check applies only to "transfers" of firearms by a Federal Firearms Licensee ("FFL") to a "person." Section 921(a)(1), in turn, defines a "person" only to include "any individual, corporation, company, association, firm, partnership, society, or joint stock company" — but not a "trust."

---

[13] 78 *Fed. Reg*. 55014.

[14]

http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201504&RIN=1140-AA43

Furthermore, BATFE has also ignored the historic fact that 18 U.S.C. § 921(a)(1) became law after the NFA which, because it was enacted earlier under Congress's taxing power, applied to persons as defined by the IRC, which included a "trust" as a person subject to the Act.[15]    Despite this plain language differentiating the classes of persons subject to the two laws, BATFE forged ahead on its mission to conflate the two definitions so as to make the NICS check to apply when a "person" (as defined by the GCA, not by the NFA), acquires an NFA-approved firearm.

The BATFE Dakota Silencer letter of March 17, 2014, on which the BATFE relies, twice correctly recognized that a trust is not a "person," but then misstated the NICS rule as one that applies to **every transfer** of a firearm, regardless of whether the transferee was a person as defined in the GCA or the NFA:

> Federal firearms law at 18 U.S.C. Section 922(t)(1) requires [FFLs] to run a NICS check "before completion of the transfer," and verify the identity of the transferee.  A85.

Conspicuously missing from BATFE's purported recitation of section 922(t)(1) is the phrase that limits the application of the FFL's obligation to run a NICS check only as to a transfer of a firearm "to any other **person** who is not licensed under this chapter." *Id.* (emphasis added).

---

[15] Implementing the NFA, 27 C.F.R. § 479.11 defines "person" as a "partnership, company, association, trust, estate, or corporation, as well as a natural person."

BATFE claims to be concerned that a "person," who would otherwise not pass a NICS check, would attempt to evade that check by obtaining a NFA firearm in the name of a "trust." 78 Fed. Reg. 55016. In seeking to close that alleged "loophole," BATFE changes both the NFA process and the GCA process. By regulatory fiat, BATFE would first rewrite 18 U.S.C. § 922(t)(1) so as to include all firearms transfers, not just to those involving "persons" as defined in section 921(a)(1). BATFE would also erase the NFA exemption to the NICS check provided by section 922(t)(3)(B), by still requiring "responsible persons" to submit to NICS checks, even though the statute exempts the transfer from NICS.

Instead of applying the law as it is written, BATFE seeks to usurp Congress's authority — apparently because it appears to BATFE that the Brady Bill as it was written does not extend the NICS check as far as BATFE wanted. It is not, however, for the BATFE to remedy a statute that it deems is inadequate. Rather, that task is for "those who write the laws, but not ... those who apply them." *See* A. Scalia & B. Garner, *Reading Law* at 352-53 (West: 2012).

### b. If, as BATFE Admits, a Trust is Not A Person, Then a Trust Can Register and Possess a Machinegun.

With certain limited exceptions, 18 U.S.C. § 922(o) makes it illegal for "any person to transfer or possess a machinegun." 18 U.S.C. § 921(a)(1) defines "person" as including "any individual, corporation, company, association, firm, partnership, society, or joint stock company." This definition clearly does not

include a "trust." See fn.15, *supra*. As noted above, BATFE has affirmed that "unincorporated trusts are not 'persons' under the GCA...."  And because they are not persons, presumably a trust could manufacture or possess a machinegun, if approved by the Attorney General under the NFA, and not be in violation of 18 U.S.C. § 922(o).

Pursuant to BATFE's March 17, 2014 letter's acknowledgment that a trust is not a "person," the Watson trust applied to the BATFE for permission to manufacture a machinegun. BATFE initially approved the request, but later revoked that approval. By letter, BATFE explained its reversal, insisting that the "fact that an unincorporated trust is not included in the definition of 'person' under the GCA does not mean that an individual may avoid liability ... by placing a machinegun 'in trust.'" A98.

BATFE claims that Congress' omission of "trust" in the list of entities that qualify as "persons" in the GCA could not possibly mean that trusts are not restricted by the statute.   Instead, BATFE argues, the omission must mean that trusts — unlike individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies — "cannot make or hold property." *Id*.  According to BATFE, under the GCA a "trust" must be completely "disregarded" as a "non-entity" — unrecognized as a matter of law. A98.

Having disqualified a trust as an entity entitled to "make or hold property," and therefore not entitled to possess or manufacture any firearm, a trustee would be subject to the GCA as a "person."  By stripping the trustee of his fiduciary duties, BATFE would recognize him as a mere "individual acting on behalf of the trust to be the proposed maker/possessor of the machinegun...." Thus, as an "individual," BATFE has transformed the trustee into a "person" within the meaning of 18 U.S.C. § 921(a)(1)(A) and, as an individual, the trustee would be prohibited from manufacturing or possessing a machinegun.

The district court disregarded the fact that, under state law, there are all sorts of actions a trustee may take on behalf of the trust, such as buying and selling property, where he is acting as trustee — not in his "individual capacity."  The district court reasoned that, because a trust is not a "legal 'person' but rather a legal term for a relationship having certain characteristics…"  a "Trust is not an entity distinct from its trustees and capable of legal action on its own behalf' but merely represents a 'fiduciary relationship with respect to property'" and that it "cannot contract or hold property."[16]  A42.  However, there is not citation to any case, but instead citations to the Restatement (Third) Trusts and Am.Jur.2d Trusts.

However, instead of relying on the fiduciary nature, the district court should have followed the well-established rule to "respect ... the Legislature's power to

---

[16] When it comes to the NFA, the BATFE claims that a trust is a legal entity.  78 Fed. Reg. 55016.

define the terms that it uses in legislation." *See Meese v. Keene*, 481 U.S. 465, 484 (1987).  Indeed, the district court failed to follow the usual rule that "[s]tatutory definitions control the meaning of statutory words...." *Lawson v. Suwannee Fruit & Steamship Co.*, 336 U.S. 198, 201 (1949).

"The venerable canon of statutory construction—*expressio unius est exclusio alterius*—essentially says that where a specific list is set forth, it is presumed that items not on the list have been excluded."  *Lewis v. Alexander*, 685 F.3d 325, 347 (3d Cir. 2012).  Watson was not acting in his individual capacity, but in his capacity as a trustee. However, if the district court essentially "pierced the veil" of trusteeship to get at the "individual human being" underneath, why would it be necessary for section 921(a)(1) to include corporations and other entities in its definition of person, since corporate officers are nothing more than individuals acting on behalf of corporations?

There is nothing in GCA that authorizes BATFE to dislodge Watson from his trusteeship in order to treat him as an individual human being, and thereby to place him in his capacity as an individual under the machinegun ban. It was clear error for the district court below to have ruled otherwise and under the plain language of § 922(o), trusts are not excluded from owning machineguns.

## **CONCLUSION**

For the foregoing reasons, Watson respectfully requests this Court reverse the lower Court's judgment.

Respectfully Submitted,

/s/ Alan Beck                        /s/ Stephen D. Stamboulieh
Alan Alexander Beck                  Stephen Dean Stamboulieh
Counsel for Appellant                Counsel for Appellant

## REQUIRED CERTIFICATIONS

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,547 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

I further certify to the following:

I am a member in good standing of the bar of this Court.

The text of the electronic brief is identical to the text in the paper copies.

The electronic brief has been scanned for viruses and found to be virus free.


/s/ Stephen D. Stamboulieh
Stephen Dean Stamboulieh
Counsel for Appellant

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2015, I electronically filed the foregoing Brief and Appendix Volume I with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


/s/ Stephen D. Stamboulieh
Stephen Dean Stamboulieh
Counsel for Appellant

# TABLE OF CONTENTS

**Page**

Memorandum, filed July 22, 2015 ........................................................................A1

Order, filed July 22, 2015 ..................................................................................A52

Notice of Appeal, August 1, 2015 .....................................................................A54

Order, filed August 13, 2015 .............................................................................A57

Judgment, filed August 13, 2015 .......................................................................A61

## Volume II

Lower Court Docket Entries 2:14-cv-06569-SD ................................................A62

Lower Court Docket Entries 2:15-cv-02202-SD ................................................A65

Complaint for Declaratory and Injunctive Relief, filed April 24, 2015 ..............A68

    Exhibit A-Batfe Letter dated March 17, 2014 to Dakota Silencer ............A87

    Exhibit B-Approved Application to Make and Register a Firearm ...........A90

    Exhibit C-Approved and Disapproved Application to Make and
    Register a Firearm.....................................................................................A95

    Exhibit D-Letter from William J. Boyle, III, Chief of the National
    Firearms Act Branch.................................................................................A97

    Exhibit E-Letter from Special Agent Rabach............................................A99

    Exhibit F-Receipt for Property and Other Items provided to Plaintiff by
    Special Agent Kovach .............................................................................A102

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ONE PALMETTO STATE ARMORY | : | NO. 15-2202 (consolidated)[1] |
| PA-15 MACHINEGUN RECEIVER/FRAME, | : | |
| UNKNOWN CALIBER, SERIAL NUMBER | : | |
| LW001804, defendant | : | |
| And | : | |
| WATSON FAMILY GUN TRUST, claimant | : | |

MEMORANDUM

Dalzell, J.                                                                 July 22, 2015

## I.    **Introduction**

Ryan S. Watson applied to the ATF to make and possess a machine gun[2], but his

application was ultimately denied for violating several Federal statutes.   He therefore brings this

action for declarative and injunctive relief, claiming that 18 U.S.C. § 922(o), 26 U.S.C. § 5801 et

seq., which codifies the National Firearms Act ("NFA"), and the implementing regulations 27

C.F.R. § 479.1 et seq. unconstitutionally ban the transfer or possession of machine guns,

impermissibly tramples upon the Commerce Clause under Article I of the United States

Constitution, and violate his Second, Fifth and Fourteenth Amendment rights.[3]   He challenges

---

[1] On June 22, 2015 we consolidated the Government's forfeiture action at C.A. No. 15-2202 with
Ryan Watson v. Loretta Lynch and Thomas E. Brandon, respectively Attorney General and
Acting Director of the Bureau of Alcohol, Tobacco, Firearms & Explosives, which was assigned
C.A. No. 14-6569.  We substituted the names of these officeholders pursuant to Fed. R. Civ. P.
25(d).

[2] We adopt the parties' spelling for the firearm at issue except when citing the National Firearms
Act of 1934 ("NFA"), which uses the single word spelling, "machinegun."

A1

the constitutionality of the statutes facially and as-applied.

Defendants Lynch and Brandon (collectively, "the Government") seek dismissal under Rule 12(b)(1) and 12(b)(6) or, in the alternative, move for summary judgment. The Government contends we lack subject matter jurisdiction over Watson's constitutional claims because he lacks standing to assert them. It also maintains that the challenged laws are consistent with the Second Amendment and the Due Process Clause, were enacted under Congress's Commerce Clause power. The Government urges that we dismiss Watson's Equal Protection and detrimental reliance claims because it contends he has failed to establish the necessary elements.

We have jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346 because Watson's claims arise under the U.S. Constitution and the laws of the United States and the Government is the defendant.

For the reasons detailed below, we will deny the Government's motion in part and grant it in part. We conclude that Watson has standing to challenge Section 922(o) and the NFA prohibitions on the manufacture and possession of machine guns. But we also hold that his Second Amendment challenge to those statutes fails facially and as applied to him under well-

---

[3] 18 U.S.C. § 922(o) provides that

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
> (2) This subsection does not apply with respect to—
> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before [1986].

The NFA is codified at 26 U.S.C. § 5801 et seq., and is part of the Internal Revenue Code of 1986. See https://www.atf.gov/file/58141/download (last accessed on July 8, 2015).

established principles from our Court of Appeals, as does his claim that Congress exceeded its power under the Commerce Clause in enacting those laws. We also find his due process and equal protection challenges fail for the reasons detailed below, and his claim of detrimental reliance has no merit.

Accordingly, we will grant the Government's motion to dismiss Watson's complaint, but will await definitive action from the Government as to its forfeiture action against the machine gun.

## II.    **Standard of Review**

The Government filed a motion to dismiss pursuant to both Rule 12(b)(1) and Rule 12(b)(6) or, in the alternative, for summary judgment, and we will therefore discuss the legal standards as they apply to the arguments before us.

### A.    **Motion to Dismiss Under Rule 12(b)(1)**

A district court considering a motion pursuant to Rule 12(b)(1) must first determine whether that motion presents a "facial" attack or a "factual" attack on the claim at issue "because that distinction determines how the pleading must be reviewed." Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014). A facial challenge contests the sufficiency of the complaint because of a defect on its face -- such as lack of diversity among the parties or the absence of a federal question. See Mortensen v. First Federal Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). In a facial challenge, we must consider the allegations of the complaint as true and consider only those allegations in the complaint, and the documents attached thereto, in the light most favorable to the plaintiff to see whether the plaintiff has sufficiently alleged a basis for subject-matter jurisdiction. See Gould Electronics Inc. v. United

States, 220 F.3d 169, 176 (3d Cir. 2000); see also United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007) (terming a facial attack as "an alleged pleading deficiency"). Thus we apply the identical standard of review that we use in considering a motion to dismiss under Rule 12(b)(6).

A factual attack, on the other hand, challenges the actual failure of the plaintiff's claims to "comport with the jurisdictional prerequisites." Pa. Shipbuilding, 473 F.3d at 514. Such an evaluation may occur at any stage of the proceeding, but only once the defendant has filed an answer. Mortensen, 549 F.2d at 891. When a Court is confronted with a factual attack, "[it] is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and the plaintiff bears the burden of showing that jurisdiction does in fact exist. Id. Thus, a district court may consider evidence outside the pleadings, Gould Elecs. Inc., 220 F.3d at 176 (internal citation omitted), and no presumptive truthfulness attaches to the plaintiff's allegations, such that the existence of disputed material facts does not preclude a Court from evaluating the merits of jurisdictional claims. Mortensen, 549 F.2d at 891.

A motion to dismiss for want of standing is properly brought pursuant to Rule 12(b)(1) because standing is a jurisdictional matter. Aichele, 757 F.3d at 357 (internal citation omitted).

**B.    Motion to Dismiss Under Rule 12(b)(6)**

A defendant moving to dismiss under Fed. R. Civ. P. 12(b)(6) bears the burden of proving that a plaintiff has failed to state a claim for relief. See Fed. R. Civ. P. 12(b)(6); see also, e.g., Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). A Rule 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint and "[t]he question, then, is whether the facts alleged in the complaint, even if true, fail to support the claim." Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (internal citation and quotation marks omitted). As

4

the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v.</u>

<u>Iqbal</u>, 556 U.S. 662 (2009), in order to survive a Rule 12(b)(6) motion "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face',"

<u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570).  A claim is plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged," <u>Iqbal</u>, 556 U.S. at 678.

Our Court of Appeals obliges district courts considering a motion to dismiss under Fed.

R. Civ. P. 12(b)(6) to engage in a two-part analysis:

> First, the factual and legal elements of a claim should be separated.
> The district court must accept all of the complaint's well-pleaded
> facts as true, but may disregard any legal conclusions.  Second, a
> district court must then determine whether the facts alleged in the
> complaint are sufficient to show that the plaintiff has a 'plausible
> claim for relief.'

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting <u>Iqbal</u>, 556 U.S. at

679).

In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be

taken as true and interpreted in the light most favorable to the plaintiff, and all inferences must

be drawn in his favor.  <u>See</u> <u>McTernan v. City of York, PA</u>, 577 F.3d 521, 526 (3d Cir. 2009)

(internal quotation marks omitted).  To survive a motion to dismiss, a plaintiff must allege facts

that "raise a right to relief above the speculative level on the assumption that the allegations in

the complaint are true (even if doubtful in fact)." <u>Victaulic Co. v. Tieman</u>, 499 F.3d 227, 234

(3d Cir. 2007) (quoting <u>Twombly</u>, 550 U.S. at 555).

**C.**    **<u>Motion for Summary Judgment</u>**

Summary judgment is warranted if there are no genuine issues of material fact and the

A5

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party moving

for summary judgment bears the burden of proving no genuine issue of material fact exists.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).   To that end,

the movant must inform the district court of the basis for its argument by "identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Where the movant is the

defendant or the party that does not have the burden of proof on the underlying claim, it "has no

obligation to produce evidence negating its opponent's case," National State Bank v. Federal

Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  The movant need only point to

the lack of evidence supporting the non-movant's claim.  Id.

     The reviewing court should view the facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor.  Scheidemantle v. Slippery Rock

Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).   A factual dispute is

"genuine" if it turns on "evidence on which the jury could reasonably find for the plaintiff."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  A fact is "material" if it "might

affect the outcome of the suit under the governing law."  Id. at 248.  That is, "only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude"

summary judgment.  Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir.

1998) (quoting Anderson, 477 U.S. at 248).

>    [T]he plain language of Rule 56[] mandates the entry of summary
>    judgment . . . against a party who fails to make a showing
>    sufficient to establish the existence of an element essential to that
>    party's case, and on which that party will bear the burden of proof
>    at trial.

Celotex, 477 U.S. at 322.

If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, the moving party is entitled to judgment as a matter of law. Id. The nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. It is well-established that Rule 56 obliges the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324; see also Fed. R. Civ. P. 56(c). Specifically, Rule 56(e) provides in relevant part that "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

### III.    Factual and Procedural Background

We need only recite the facts pertinent to the resolution of the motions before us. We draw our recitation primarily from plaintiff Watson's complaint. However, as the Government has moved for summary judgment, in addition to its facial attack on our subject matter jurisdiction and its motion to dismiss, we may consider matters outside the pleadings, which here encompasses the legislative history of the statutes at issue and other archival material appended to the pleadings.

Watson is a Pennsylvania citizen and the Trustee of the Watson Family Gun Trust, an unincorporated Pennsylvania Trust. Compl. at ¶¶ 4, 44. On or about May 23, 2014, Watson, as Trustee of the Watson Family Gun Trust, submitted an application in paper form to the Bureau

of Alcohol, Tobacco, Firearms and Explosives ("BATFE" or "ATF") on ATF Form 5320.1 (the

Application to Make and Register a Firearm) ("Form 1"),  to make a machine gun.  Id. at ¶ 37

and Ex. B.  He also submitted the required $200 making tax.  Id. at ¶ 37.  On or about June 24,

2014, he electronically submitted a second application to make another machine gun and paid the

$200 making tax.  Id. at ¶ 38.  On August 5, 2014, the BATFE approved the second application,

affixing the stamp and authorizing Watson to make a machine gun.  Id. at ¶ 39.  Watson made a

machine gun.  Id. at ¶ 40.[4]

Around September 10, 2014, Watson received an email from the BATFE stating it had

changed the status of the Form 1 from "Approved" to "Disapproved."  Id. at ¶ 41.  Watson

alleges the BATFE's own policies and procedures state that an approved Form 1 can only be

cancelled if "the firearm[] ha[s] not been made or modified," id. at Ex. B at 4, ¶ 5, and there is no

statutory or regulatory authority for it to revoke an issued tax stamp.  Id. at ¶ 41.

The first Form 1 application was subsequently returned with a whited-out signature box,

approval box, and date box, and marked "Disapproved" in two places on the application.  Id. at ¶

43.  Watson contends these alterations show "the first application had been approved, and the

BATFE subsequently unlawfully revoked (or attempted to revoke) the approval."  Id.  The

application was accompanied by a letter from William J. Boyle, III, Chief of the National

Firearms Act Branch, which stated in relevant part:

> Except for the possession of machineguns by or for governmental
> entities, the Gun Control Act of 1968 (GCA), as amended,
> prohibits any person from possessing a machinegun not lawfully

---

[4] Watson made his machine gun by modifying an AR-15 lower receiver into an automatic capable M-16 receiver, an irreversible modification as a result of which the firearm is permanently designated a machine gun.  Br. in Opp. at 3 and n. 2.  ATF regulations define a "receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  27 C.F.R. § 478.11.

possessed and registered prior to May 19, 1986. <u>See</u> 18 U.S.C. §
922(o). The GCA defines the term "person" to "include any
individual, corporation, company, association, firm, partnership,
society, or joint stock company." <u>See</u> 18 U.S.C. § 921(a)(1).
Pursuant to the [National Firearms Act]. . . ATF may not approve
any private person's application to make and register a
machinegun after May 19, 1986.

The fact that an unincorporated trust is not included in the
definition of "person" under the GCA does not mean that an
individual may avoid liability under section 922(o) by placing a
machinegun "in trust." Where a trust is not an entity recognized as
a "person" under the applicable law, it cannot make or hold
property and is disregarded. Consequently, in terms of an
unincorporated trust, ATF must disregard such a non-entity under
the GCA and consider the individual acting on behalf of the trust to
be the proposed maker/possessor of the machinegun.

<u>Id.</u> at Ex. D.

Watson alleges that there is no prohibition on Trusts making or possessing machine guns

under Section 922(o) because the statute's plain language does not include a Trust in the

definition of "person." <u>Id.</u> at ¶ 45. He also contends that the BATFE's contention that it "must

disregard such a non-entity under the GCA and consider the individual acting on behalf of the

trust to be the proposed maker/possessor of the machine gun" is a novel interpretation that

upends long-time common practice. <u>Id.</u> at ¶ 46. For example, Watson maintains that when a

Trust manufactures a short barreled rifle "on a Form 1," it is required to engrave on the firearm

the name of the Trust as the manufacturer, not the name of the trustee who physically makes the

firearm on behalf of the Trust. <u>Id.</u> (citing 26 U.S.C. § 5842(a)).

On or about October 10, 2014, a BATFE Field Agent contacted Watson to ask whether a

machine gun had in fact been made pursuant to the approved Form 1 and informing him such a

firearm would have to be surrendered to the BATFE. <u>Id.</u> at ¶ 48. Watson also spoke with a

BATFE attorney on or about October 15, 2014 who also told him that the firearm, if made,

9

A9

would have to be surrendered.  Id. at ¶ 49.  Thereafter, Watson expressed his concern to the

BATFE Agent that he would face criminal charges if he surrendered his machine gun.  Id. at ¶

50.

On or about November 3, 2014, Watson received a certified letter from Essam Rabach,

Special Agent in Charge of the Philadelphia BATFE Field Division, which stated in relevant

part:

> If you ha[ve], in fact, already made a machine gun in reliance on
> ATF's erroneous approval of your ATF Form 1, you should make
> arrangements . . . to abandon or otherwise surrender it.  This is
> critical not only as a matter of public safety, but because
> possession of this unregistered machine gun is a Federal Felony. . .
> Special Agent Kovach assured you that ATF is only interested in
> recovering the illegal and unregistered machine gun and has
> absolutely no interest in using your surrender of this machine gun
> to further a criminal prosecution. . . .

Id. at ¶ 51; see also Ex. E.

On or about November 14, 2014, Watson under protest surrendered his machine gun to

BATFE Special Agent Kovach "without waiving any rights to contest the illegal mandate by the

BATFE that he surrender that firearm."  Id. at ¶ 52.

Watson contends that machine guns come under Second Amendment protection as the

Supreme Court described the Amendment's ambit in United States v. Miller, 307 U.S. 174

(1939), and are not inherently dangerous.  Id. at ¶¶ 12, 13.  "Prior to 1986, registered machine

guns were involved in so few crimes that the then [BATFE director] stated during congressional

hearings that 'machine guns which are involved in crimes as so minimal so as not to be

considered a law enforcement problem.' "  Id. at ¶ 25 (internal citation omitted).  He also

contends that there is no evidence machine guns have any effect on interstate commerce.  Id. at

¶¶ 22, 25, 26.  "Even if Congress had the power to regulate machine guns under the Commerce

10

A10

Clause," Watson alleges that the ban imposed on machine guns after 1986 "is not 'regulating'

under the meaning of the Commerce Clause, especially in light of the protected Second

Amendment rights." Id. at ¶ 27.  He also maintains that the term "person" as defined in the Gun

Control Act ("GCA") does not include an unincorporated Trust, which the BATFE

acknowledged in an opinion letter to another entity.  Id. at ¶¶ 28, 29.  He alleges that the

BATFE's "new interpretation" that unincorporated trusts are prohibited from manufacturing or

possessing machine guns means the agency violated the law by approving his application in the

first place.  Id. at ¶ 54.  Watson also alleges that he made the firearm in detrimental reliance on

the BATFE's "guarantee. . . that such manufacture would not be in violation of any law."  Id. at ¶

55.  Finally, he claims that he as Trustee may make and possess a machine gun "under the plain

language of 18 U.S.C. § 922(o)," which exempts from its prohibition on the transfer or

possession of a machine gun the "possession by or under the authority of[] the United States or

any department or agency thereof."  Id. at ¶ 56 (quoting 18 U.S.C. § 922(o)(2)(A)).

Watson claims five grounds for relief.  He seeks declaratory and injunctive relief that 18

U.S.C. § 922(o) is unconstitutional or unconstitutional as applied to him in violation of the

Commerce Clause and asks that we bar the defendants from revoking his issued stamp.  Id. at ¶

61.  He also claims Section 922's machine gun ban and the BATFE's disapproval of his first

Form 1 violate the Second Amendment and he seeks a declaration that 26 U.S.C. § 5801 et seq.

is also unconstitutional or unconstitutional as-applied to him  Id. at ¶ 69.  He further claims that

the defendants deprived him of his property interest in his machine gun and approved application

in violation of the Fifth Amendment.  Id. at ¶¶ 71, 72.  Watson claims the BATFE violated his

right to Equal Protection under the Fourteenth Amendment by permitting others, but not him, to

manufacture machine guns post-1986.  Id. at ¶ 76.  Watson urges that the Agency be enjoined

A11

from enforcing Section 922(o) and Section 5801 in a manner that would result in him losing "his property interest in his Form 1 or manufactured machine gun" or being charged criminally. Id. at ¶ 79. And, finally, he seeks to estop BATFE from revoking the Form 1 on which he claims to have detrimentally relied. Id. at ¶ 79.

Watson filed his complaint on November 14, 2014. The Government filed its motion to dismiss or, in the alternative, for summary judgment on January 16, 2015. On January 23, 2015, Watson filed an uncontested motion for an Order of preservation of the machine gun, which we granted three days later. On June 12, 2015, Watson moved to consolidate this matter with the Government's later-filed forfeiture action. We granted Watson's motion to consolidate on June 22, 2015.[5]

## IV.    Discussion

### A.    Overview of the Statutory Scheme

Congress regulates the interstate firearms market through the GCA, as amended, 18 U.S.C. Chapter 44, and the NFA, 26 U.S.C. Chapter 53. MTD at 2. The BATFE is charged with the administration and enforcement of those statutes and the defendants oversee that enforcement. Id. The NFA requires, inter alia, that all who are engaged in the business of firearms, including machine guns, and all firearm owners register with the Collector of Internal Revenue, and also subjects firearms sales to a special tax and requires firearm transactions to be conducted using written forms. Id. at 2, 3. The NFA also requires a firearm maker to obtain authorization, prior to manufacturing a firearm, "in such manner as required" by the statute. Id. at 3 (quoting 26 U.S.C. § 5841(c)). With respect to machine guns, "[d]ecades of federal laws

_____

[5] By the time we closed C.A. No. 14-6569, the Government had, as rehearsed, filed the motion that we address at length here. To avoid confusion, we dispose of it notwithstanding the consolidation.

and regulations" restrict their manufacture and possession to protect from their use as "lethal weapons [that] could be used readily and efficiently by criminals or gangsters in furtherance of criminal activity." Id. at 1 (quoting United States v. Thompson/Center Arms Co., 504 U.S. 505, 517 (1992) (internal quotation marks omitted)); see also Ex. 1.

The NFA defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" or parts thereof, including "any combination of parts from which a machinegun can be assembled." Id. at 3 (quoting 26 U.S.C. § 5845). The NFA requires a would-be firearms maker to (1) file a written application to make and register the firearm, (2) pay any applicable tax, (3) identify the firearm to be made, (4) identify himself on the form, and (5) obtain the ATF's approval with the application showing such approval. Id. (citing 26 U.S.C. § 5822). The Government states that Section 5822 and the ATF's implementing regulation provide that the ATF will not approve an application to make a firearm if its making or possession "would place the person making the firearm in violation of law," including in violation of the NFA. Id. at 4; see also 27 C.F.R. § 479.65 and 26 U.S.C. § 5861(f).

The GCA supplants earlier firearms regulations, including the Federal Firearms Act of 1938, adopted under the Commerce Clause. MTD at 4; see also Ex. 2. In 1986, Congress enacted the Firearms Owners' Protection Act, adding Section 922(o) to the GCA. Id. at 5. Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," except with respect to

> (A) a transfer to or by, or possession by or under the authority of,
> the United States or any department or agency thereof or a State, or
> a department, agency, or political subdivision thereof; or
> (B) any lawful transfer or lawful possession of a machinegun that
> was lawfully possessed before [1986].

Id. (quoting 18 U.S.C. § 922(o)(2)).  The GCA defines "machinegun" by incorporating the NFA's definition.  Id.; see also 18 U.S.C. § 921(a)(23).

The Government observes that this litigation "arise[s] in part from different definitions of the term 'person' employed by the NFA and GCA."  MTD at 5.  The GCA defines "person" to "include any individual, corporation, company, association, firm, partnership, society, or joint stock company."  Id.; see also 18 U.S.C. § 921(a)(1).  The NFA does not specifically define "person."  The Government states that in the absence of a definition, the general definition in the Revenue Code controls: "an individual, trust, estate, partnership, association, company, or corporation, " see 26 U.S.C. § 7701(a)(1); see also Br. in Opp. at 30.  Accordingly, the Government contends that the definition of "person" under the NFA includes "Trust", but the GCA definition does not.  MTD at 5.

### B.      Threshold Inquiry: Whether Watson's Challenges Are Facial or As-Applied

The difference between a facial challenge and an as-applied challenge is significant.

A plaintiff asserting a facial challenge "seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question."  City of Chicago v. Morales, 527 U.S. 41, 55 n. 22 (1999).  Thus, the plaintiff succeeds in a facial challenge only by showing that "no set of circumstances" exists under which the statute at issue would be valid, Heffner v. Murphy, 745 F.3d 56, 65 (3d Cir. 2014) -- a particularly demanding standard.

The Supreme Court disfavors facial challenges for several reasons.  As the Court explained in Washington State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008), "Claims of facial invalidity often rest on speculation" about the reach of a statute and "run contrary to the fundamental principle of judicial restraint" by anticipating a constitutional rule before it can be decided.  Because the remedy for a successful facial challenge is the

14

complete invalidation of the law, "we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Id.

By contrast, as our Court of Appeals has held, "[a]n as-applied attack ... does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010). The distinction, then, between a facial challenge and an as-applied challenge goes to the scope of the statute's claimed constitutional infirmity and the breadth of the remedy sought. See Citizens United v. Federal Election Comm'n, 558 U.S. 310, 331 (2010). The remedy for a facial challenge is the broad invalidation of the statute in question, but the remedy for an as-applied challenge bars its enforcement against a particular plaintiff alone under narrow circumstances. See CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 624 (3d Cir. 2013). Our Court of Appeals has also cautioned that district courts granting injunctions in such cases should craft remedies "no broader than necessary to provide full relief to the aggrieved plaintiff." McLendon v. Continental Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990) (internal citation omitted).

Watson's Commerce Clause claim seeks "declaratory and injunctive relief barring defendants from attempting to unilaterally revoke an issued stamp on his Form 1 and further," a determination that Section 922(o) is "unconstitutional or unconstitutional as applied against" him, see Compl. at ¶ 61. He similarly frames his Second Amendment challenge to Section 922(o) and 26 U.S.C. § 5801 et seq., see id. at ¶ 69. The Government does not address whether Watson's claim is properly facial or as-applied. But we conclude that Watson asserts his Commerce Clause and Second Amendment as both facially and as-applied.

While the "usual judicial practice" is to address an as-applied challenge before a facial

15

A15

challenge, <u>United States v. Mitchell</u>, 652 F.3d 387, 406 (3d Cir. 2011) (internal citations omitted), our Court of Appeals has reversed that order in the case of "presumptively lawful" prohibitions -- as here. <u>See</u> <u>United States v. Barton</u>, 633 F.3d 168, 172 (3d Cir. 2011).

## C.    <u>Watson's Standing to Bring This Suit</u>

The "irreducible constitutional minimum" of standing contains three elements: "(1) the invasion of a concrete and particularized legally protected interest and resulting injury in fact that is actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Blunt v. Lower Merion School Dist.</u>, 767 F.3d 247, 278 (3d Cir. 2014) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).

The Government argues that we must dismiss Watson's Second Amendment and Commerce Clause claims because he fails to satisfy the traceability and redressability requirements for standing. MTD at 8. It argues that Pennsylvania law independently bars Watson's possession of a machine gun. <u>Id.</u> at 9. Pursuant to 18 Pa. Cons. Stat. Ann. § 908(a), "[a] person commits a misdemeanor of the first degree if, except as authorized by law, he . . . possesses any offensive weapon," and where subsection (c) defines an "offensive weapon" to include a "machine gun". As a result, the Government maintains, Watson cannot show that the harm he alleges "is caused by the NFA and GCA provisions that likewise prohibit him from making or acquiring" a machine gun. MTD at 9. The Government contends that Watson cannot show "traceability" because the Commonwealth's prohibition undercuts his argument that his alleged Second Amendment and Commerce Clause injuries are "traceable to federal law and not the result of the independent action of some third party not before the court." <u>Id.</u> at 9, 10

16

(quoting <u>Lujan</u>, 504 U.S. at 560) (internal quotation marks and alterations omitted).  In a like

vein, the Government argues that granting Watson's request for declaratory relief would not

redress these two claimed injuries because "the limitations imposed by [state law] would remain

unchanged." <u>Id.</u> at 10 (quoting <u>McConnell v. FEC</u>, 540 U.S. 93, 229 (2003)).

Pennsylvania provides an exception to the machine gun prohibition when the possessor

"complied with the National Firearms Act." <u>Id.</u> at 10 n. 7 (quoting 18 Pa. Cons. Stat. Ann. §

908(b)(1)).  The Government maintains this safe harbor does not affect its standing analysis

because, should Watson succeed on his two claims, "there would be no NFA regulation available

for him to comply with, leaving him subject to the Pennsylvania prohibition." <u>Id.</u>

Watson responds in opposition that the Government's argument mischaracterizes

Pennsylvania law "as independently forbidding [his] possessing a machine gun" and forestalling

him from showing that the NFA and GCA caused him any harm.  Br. in Opp. at 6, 7.  He points

us to the defendants' communications with him that cite those federal statutes as the reason for

revoking his applications and confiscating his firearm.  <u>Id.</u> at 7.

> Quite simply, the [d]efendants used the NFA and GCA as a basis
> to violate [p]laintiff's constitutionally protected rights and
> accordingly, [his] injury is directly traceable to the [d]efendants
> and the challenged laws, and a favorable ruling will redress the
> injury.

<u>Id.</u>  He observes that the Pennsylvania statute's exception means the state statute presents no bar

to his machine gun possession because he claims to be in full compliance with the NFA.  <u>Id.</u>  He

further argues that, were we to declare machine guns protected under the Second Amendment,

striking down Section 922(o) and the NFA, "any theoretical Pennsylvania prohibition on

machine guns would also be unconstitutional" because the Second Amendment right to bear

arms validated in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), was incorporated against

17

the States in <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742 (2010).  <u>Id.</u> at 8.  Finally, Watson

contends that the defendants' argument at best attacks his standing to challenge the NFA, but has

no merit with respect to his other claims for relief.  <u>Id.</u>

     The Government replies that Watson's response is limited to his Second Amendment

claim and "does not address in any way" its contention that his Commerce Clause claim, Count I

of his complaint, "cannot be redressed in this action."  Reply at 2.  The Government contends that

by Watson's failure to reply to its argument that he lacks standing as to this cause of action, he

thereby waives his opportunity to demonstrate standing.  <u>Id.</u>  The Government also contests

Watson's argument that the future invalidation of the Pennsylvania statute could demonstrate

redressability.  "Plaintiff has not sued Pennsylvania, and redressability for [his] purported

Second Amendment 'injury' is therefore lacking."  <u>Id.</u>

     In his surreply, Watson maintains that the Government seeks to mislead the Court into

believing that Pennsylvania law prohibits the possession of machine guns -- a contention he

claims would be readily refuted through discovery of the records of the National Firearms

Registration and Transfer Record of registered machine guns owned by civilians in

Pennsylvania.  Sur. at 1.

     As we stated above, a motion to dismiss for want of standing is properly brought pursuant

to Rule 12(b)(1) because standing constitutes a jurisdictional threshold.  <u>Aichele</u>, 757 F.3d at 357

(internal citation omitted).  Our standing inquiry must be "especially rigorous when reaching the

merits of the dispute as it would force us to decide whether an action taken by one of the other

two branches of the Federal Government was unconstitutional." <u>Raines v. Byrd</u>, 521 U.S. 811,

819-20 (1997).  Each element of the standing inquiry "must be supported in the same way as any

other matter on which the plaintiff bears the burden of proof."  <u>Hayes v. Wal-Mart Stores, Inc.</u>,

18

725 F.3d 349, 361 n. 11 (3d Cir. 2013) (quoting <u>Lujan</u>, 504 U.S. at 561).  Nonetheless, we are

mindful of Justice Scalia's admonition that "when an individual who is the very <u>object</u> of a law's

requirement or prohibition seeks to challenge it, he always has standing."  Antonin Scalia, <u>The</u>

<u>Doctrine of Standing as an Essential Element of the Separation of Powers</u>, 17 Suffolk U.L.Rev.

881, 894 (1983) (emphasis in original) (cited with approval in <u>Aichele</u>, 757 F.3d at 362.)

Our first step is to determine whether the movant proffers a facial or factual attack.  <u>In re</u>

<u>Schering Plough Corp. Intron/Temodar Consumer Class Action</u>, 678 F.3d 235, 243 (3d Cir.

2012).  As the Government filed its motion to dismiss before filing an answer, its motion

constitutes a facial attack on Watson's claims and we apply the identical standard of review that

we use in considering a motion to dismiss under Rule 12(b)(6), that is to say, we consider only

the allegations of Watson's complaint in the light most favorable to him.  <u>See</u> <u>Gould Elec. Inc.</u>,

220 F.3d at 176.  Here, Watson points to the disapproval of his Form 1 and the Government's

letter from William J. Boyle, III, Chief of the National Firearms Act Branch, in which Boyle

cites both the GCA's prohibition against possessing a machine gun and the NFA's ban on the

ATF approving any application to make a machine gun after May of 1986, <u>see</u> Boyle letter,

Compl. at Ex. D.  Watson also alleges that he complied with the NFA's requirements to (1) file a

written application to make and register the firearm, (2) pay any applicable tax, (3) identify the

firearm to be made, (4) identify himself on the form, and (5) obtain the ATF's approval as shown

on the application.  <u>See</u> Compl. at ¶¶ 37, 38, 39.

Turning first to the traceability requirement, a federal court may "act only to redress

injury that fairly can be traced to the challenged action of the defendant, and not injury that

results from the independent action of some third party not before the court."  <u>Aichele</u>, 757 F.3d

at 366 (internal citation omitted).  But, as our Court of Appeals has explained, this causation

inquiry is not cognate with tort proximate cause: "there is room for concurrent causation in the analysis of standing." Id. (citing with approval Libertarian Party of Va. v. Judd, 718 F.3d 308, 316 (4th Cir. 2013) (holding that if a petition witness residency requirement was "at least in part responsible for frustrating [plaintiff's] attempt to fully assert his First Amendment rights in Virginia, the causation element of Lujan is satisfied")). Indeed, our Court of Appeals has held that an indirect causal relationship will suffice, so long as there is "a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant[s]." Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 142 (3d Cir. 2009) (internal citation omitted).

The Government urges us to rely on decisions from other Courts of Appeals that found no standing where activity was banned by both state and federal statute, and thus the alleged injury could not be traced to a federal statute alone. See, e.g. White v. United States, 601 F.3d 545 (6th Cir. 2010) (no standing for gamefowl sellers to challenge Animal Welfare Act provisions banning animal fighting because alleged injuries not traceable to AWA alone); see also San Diego Cty. Gun Rights Committee v. Reno, 98 F.3d 1121, 1130 (9th Cir. 1996) (injury not traceable to federal statute banning assault weapons where a separate state law "also bans the manufacture, sale and distribution of certain delineated assault weapons").

Our Court of Appeals has not considered in a precedential opinion whether the existence of a state statute banning activities similar to those prohibited in a challenged federal statute undercuts traceability. But White and Reno do not persuade us. The state statutes in each of these cases are not cognate with what is before us. In White, for example, where the Sixth Circuit concluded that gamefowl sellers' alleged injuries were not traceable to only the AWA, the AWA restricted various activities associated with animal fighting but did not prohibit animal fighting or cockfighting, whereas "[c]ockfighting is banned to a greater or lesser degree in all

20

fifty states." White, 601 F.3d at 552.  Thus, the Sixth Circuit concluded that plaintiffs' alleged

injury was not traceable to the challenged law alone because state laws independently banned

certain comparable activity.  And, in Reno, the Ninth Circuit pointed to an earlier enacted

California statute, the Roberti-Roos Assault Weapons Control Act of 1989, to conclude

plaintiff's allegation of economic injury due to the federal assault weapon ban must fail because

the challenged federal statute "is neither the only relevant piece of legislation nor the sole factor

affecting the price of grandfathered weaponry."  Reno, 98 F.3d at 1130.

Unlike the state statutes at issue before the Sixth and Ninth Circuits, the Commonwealth

statute at issue here does not supply freestanding grounds to forbid machine gun use or

possession, if the maker or owner "complie[s] with the National Firearms Act," 18 Pa. Cons.

Stat. Ann. § 908(b)(1).  Rather, Pennsylvania does not independently ban such firearms but

rather piggybacks on an existing federal statute by incorporating its requirements.  Watson

claimed that he complied with the NFA's five requirements, see Compl. at ¶¶ 37, 38, 39, which

we take as true and interpret in the light most favorable to him, as we must in this posture.  Such

compliance brings him under the Commonwealth's safe harbor exception and therefore leaves no

independent ground to prohibit his machine gun possession.  Equally persuasive is Watson's

argument that, should he prevail in his NFA challenge, the Commonwealth statute would also

fail.  We do not agree with the Government that Watson has failed to show that his alleged

injuries are traceable to the federal statutes he challenges.  As the Government points to no other

Commonwealth statute that undercuts Watson's claim that his alleged Commerce Clause injury

is also traceable to the federal statutes he challenges, we conclude that he has met the second

prong of the standing requirement and can assert both constitutional challenges.

Our Court of Appeals teaches that redressability is "closely related" to traceability:

"[W]hile traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?)."  Toll Bros., 555 F.3d at 142 (internal citation omitted) (parenthetical remarks in original).  This element requires a showing that the injury will be redressed by a favorable decision but it is also "sufficient for the plaintiff to establish a substantial likelihood that the requested relief will remedy the alleged injury in fact."  Id. at 143 (internal citation and quotation marks omitted).  The Government points us to a nonprecedential decision from our Court of Appeals to argue that granting Watson the relief he seeks would not redress his alleged Second Amendment and Commerce Clause injuries because the limitations imposed by state law would remain in place.  See Coastal Outdoor Adver. Grp. LLC v. Twp. of E. Hanover, NJ, 397 F. App'x 794, 795 (3d Cir. 2010).

We do not agree that our Court of Appeals's decision in Coastal Outdoor compels the conclusion that Watson fails to meet the standing requirement's third prong.  There, our Court of Appeals concluded that, although the billboard company suffered an injury traceable to a Township ordinance, the injury the plaintiff suffered was nonetheless not redressable because unchallenged zoning restrictions would still prevent it from erecting billboards "even if the Township's superseded prohibition on billboards were unconstitutional."  Id.

That is not the case here.  Although Watson does not challenge the Commonwealth statute, he points out that its reliance on the framework of the NFA means a decision striking down that federal statute would also sweep away the Pennsylvania prohibition on machine guns.  We agree.  See McDonald, 561 U.S. at 591 ("We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in Heller.").

We conclude that Watson satisfies all aspects of standing to challenge the NFA and GCA and will therefore deny the Government's motion to dismiss for want of subject matter

22

A22

jurisdiction.

**D.     Watson's Second Amendment Challenge**

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

**1.     The Government's Motion to Dismiss**

The Government offers a series of arguments as to why Watson's machine gun is properly excluded from Second Amendment protection.

First, the Government points to the Supreme Court's recognition that the rights secured by the Second Amendment are not unlimited to argue that longstanding prohibitions against certain types of weapons impose continued ineligibility for Second Amendment protection after Heller.  MTD at 13, 14 (quoting Heller, 554 U.S. at 626, 621-22).  "Consistent with the view expressed in Heller, the Third Circuit and every other federal circuit to subsequently address the issue has determined there is no Second Amendment right to possess a machine gun."  MTD at 15.  The Government argues further that the Second Amendment right upheld in Heller was a right to bear arms in self-defense, not an individual's right to possess any specific firearm or type of firearm.  Id. at 16 (citing Heller, 554 U.S. at 627 and United States v. Marzzarella, 614 F.3d 85, 94-95 (3d Cir. 2010), cert. denied, 131 S.Ct. 958 (2011)).  At the same time, the Government rejects as foreclosed by Heller, Watson's argument that defense of country is a "new central purpose of the Second Amendment."  Reply at 3.

Our Court of Appeals in Marzzarella "adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds."  MTD at 12.

23

A23

> First, we ask whether the challenged law imposes a burden on
> conduct falling within the scope of the Second Amendment's
> guarantee. If it does not, our inquiry is complete. If it does, we
> evaluate the law under some form of means-end scrutiny. If the
> law passes muster under that standard, it is constitutional. If it fails,
> it is invalid.

614 F.3d at 89 (internal citation omitted).  The Government contends that analysis requires

Watson's claim to be resolved only at Marzzarella's Step One, because Heller's "presumptively

lawful regulatory measures" against certain longstanding prohibitions are "exceptions to the right

to bear arms."  MTD at 17 (quoting Marzzarella, 614 F.3d at 91 (citing Heller, 554 U.S. at 627));

see also Joseph Blocher, Categoricalism and Balancing in First and Second Amendment

Analysis, 84 N.Y.U. L. Rev. 375, 413 (2009) ("Heller categorically excludes certain types of

'people' and 'Arms' from Second Amendment coverage, denying them any constitutional

protection whatsoever") (cited with approval in Marzzarella, 614 F.3d at 91 n. 6).  The

Government urges that restrictions on machine gun possession are longstanding and

presumptively lawful restrictions derived from historical regulation of machine guns.  MTD at

17, 18; see also Drake v. Filko, 724 F.3d 426, 432 (3d Cir. 2013), cert. denied sub nom. Drake v.

Jerejian, 134 S.Ct. 2134 (2014).  "Historical State restrictions likewise demonstrate that . . . laws

prohibiting an entire class of weapons as dangerous or unusual are not anomalous."  MTD at 19

(citing state statutes); see also Exs. 4 (Founding-Era state militia laws[6] governing permitted

---

[6] Indeed, Congress in 1792 in the Second Militia Act, § 1, 1 Stat. 271-72, provided that:

> every citizen so enrolled and notified, shall, within six months
> thereafter, provide himself with a good musket or firelock, a
> sufficient bayonet and belt, two spare flints, and a knapsack, a
> pouch, with a box therein, to contain not less than twenty four
> cartridges, suited to the bore of his musket or firelock, each
> carriage to contain a proper quantity of powder and ball; or with a
> good rifle, knapsack, shot-pouch, and powder-horn, twenty balls
> suited to the bore of his rifle, and a quarter of a pound of powder;

weapons) and 6 (selected 19th and 20th century state laws prohibiting possession of certain categories of weapons).

Should we nevertheless hold that the machine gun ban burdens Watson's Second Amendment rights, the level of scrutiny remains unresolved under Heller. The Government presses the Supreme Court's reasoning in Bullock v. Carter, 405 U.S. 134, 143 (1972) that "not every limitation or incidental burden on the exercise of a constitutionally protected right is subject to a stringent standard of review", to argue that the Second Amendment triggers more than a single standard of review. MTD at 21 (internal quotation marks omitted); see also Marzzarella, 614 F.3d at 97.

The Government argues that the burden here is minimal and, as such, does not require heightened scrutiny. Id. A machine gun prohibition, the Government contends, does not substantially burden the self-defense right central to the Second Amendment. Id. at 22 (quoting Heller, 554 U.S. at 628). While the Government contends that the challenged provisions would satisfy strict scrutiny because they are "presumptively lawful," id. at 24 n.16 (quoting Heller, 554 U.S. at 527 n. 26), it maintains the statutes "readily withstand" the Third Circuit's three-part intermediate scrutiny test. Id. at 24.[7]

_____

and shall appear, so armed, accoutered and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned [O]fficers shall severally be armed with a sword or hanger and esponton, and that from and after five years from the passing of this act, all muskets from arming the militia as is herein required, shall be of bores sufficient for balls of the eighteenth part of a pound.

[7] The Government describes the requirements of our Court of Appeals's test for intermediate scrutiny as showing (1) a reasonable fit between the challenged law and the governmental interest, (2) the Court's "substantial deference to the legislature's predictive judgments," Drake, 724 F.3d at 436-37 (alteration's omitted), and (3) empirical evidence "needed to satisfy

25

The Government points, inter alia, to the NFA's legislative history where Congress found "there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, [but] there is no reason why anyone except a law officer should have a machine gun or sawed-off shotgun." Id. at 23 and Ex. 7 (quoting H.R. Rep No. 73-1780, at 1 (1934)).

> Because other categories of firearms are equally useful -- if not more so -- for self-defense than machine guns, the burden on the Second Amendment right is at most "marginal [and] incremental" and therefore does not warrant significantly heightened scrutiny.

MTD at 23 (quoting United States v. Decastro, 682 F.3d 160, 166 (2d Cir. 2012)).  While our Court of Appeals has adopted certain First Amendment approaches for Second Amendment cases, the Government maintains that our Circuit has repeatedly rejected adopting the First Amendment's distinctions between content-based, and time, place, and manner regulation. Reply at 6.  See Barton, 633 F.3d at 172 n. 3; see also Drake, 724 F.3d at 435.

Finally, the Government rejects Watson's assertion claiming that there is no statistical support regarding the criminal use of machine guns, and it relies on data from the National Crime Information Center concerning machine gun theft and a 1991 study finding 35% of juvenile inmates had owned "a military style automatic or semi-automatic rifle" prior to their confinement.  Reply at 9.  "[I]f the eight decades of federal legislation regulating machine guns . . . have succeeded in limiting [their] use for criminal purposes, such success would hardly cast doubt on previous findings about the criminal utility of machine guns or their other dangers.  Id. See also Drake, 724 F.3d at 436-37 ("When reviewing the constitutionality of statutes, courts accord substantial deference to the legislature's predictive judgments.") (internal citation and

---

heightened judicial scrutiny of legislative judgments" which varies with "the novelty and plausibility of the justification raised."  MTD at 24 (quoting Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391 (2000)).

alteration omitted).

### 2.    Watson's Brief in Opposition

Watson responds with several arguments.

He observes that the Second Amendment recognizes valid justifications besides self-defense -- such as hunting and resistance to tyranny, Br. in Opp. at 9.  He argues first that machine guns "are overwhelmingly chosen by militaries throughout the world for defense of [country], . . . a lawful purpose of firearm ownership" and one recognized by the Supreme Court in Heller, id. at 11.  And he maintains further that the Second Amendment also protects military use, Surreply at 2, and that machine guns have "self-defense value."  Id. at 3.  He urges that we distinguish between machine guns and "destructive devices" (such as "anti-personnel mines, rocket-propelled grenades. . .[and] surface-to-air missiles.")  Id.

Thus, he contends, we should not apply the Marzzarella two-step test because 18 U.S.C. § 922(o)'s prohibition on machine guns manufactured after 1986 "amounts to a categorical ban similar to those struck down in Heller and McDonald."  Br. in Opp. at 10.

Nonetheless, were we to apply the Marzzarella test, Watson next contends, we should still find Section 922(o) unconstitutional.  Watson argues that we should adopt traditional means-end scrutiny from First Amendment analysis to find that Section 922(o) is a content-based prohibition that must be analyzed under strict scrutiny.  Id. at 21, 22.  He contends that the "dangerous and unusual" standard pertains only to the way in which a firearm is carried -- that is, the common law crime of affray[8] --  and not, as here, to the mere possession of a firearm, id. at 13, 14.  Therefore, so his argument goes, Heller's prohibition against "dangerous and unusual"

---

[8] Without the slightest citation to judicial authority, Watson cabins Heller's "dangerous and unusual weapons", 554 U.S. at 627, to that common law crime.

27

weapons is akin to a time, place, manner restriction under the First Amendment, not a categorical prohibition on the possession of certain weapons not covered under the Second Amendment.  Id. at 17.  Accordingly, Watson argues that we must evaluate the machine gun prohibition under "the appropriate form of means-end[] scrutiny, and not simply stop the test at the first step."  Id.

Watson also contests the Government's argument that longstanding prohibitions on machine gun possession or purchase are "derived from historical regulations," id. at 17, 18.  He contends that, for the most part, the state statutes on which the Government relies do not support a machine gun ban.  Id. at 19.

Finally, Watson maintains that Section 922(o) cannot survive the strict scrutiny requirement that a statute serve a "compelling governmental interest and be narrowly drawn to achieve that end."  Id. at 22 (internal citation and alterations omitted).  Watson argues that the Government fails to detail how the machine gun ban advances its stated interest in "promoting public safety and combatting crime" and disputes that its regulations serve either end.  Id. at 25.  He also argues the prohibition is not narrowly tailored.  Id. at 22, 23.  He contends the facts show that machine guns are held by collectors and only rarely figure in violent crime, whereas constitutionally-protected handguns are at the root of "nearly 90% of all violent crimes involving firearms."  Id. at 25, 26.  Nor can Section 922(o) survive under the more deferential intermediate scrutiny test he urges that we borrow from First Amendment jurisprudence.  Id. at 24 (quoting Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622 (1994)).  Ultimately, he asserts that the Government has presented no evidence of machine guns' dangers because (1) the Government fails to detail when machine gun thefts occurred, whether the weapons were recovered or to link them to crimes, and (2) its data on juveniles inmates confuses automatic with semi-automatic weapons. Surreply at 7.

28

### 3.     **Applicable Law**

The Supreme Court reached <u>Heller</u>'s holding that the District of Columbia's comprehensive ban on handguns violated the Second Amendment by parsing the Amendment's text, reviewing analogous state statutes and constitutions, and tracking the Amendment's historical understanding. <u>Heller</u>, 554 U.S. 576-620. "[T]he inherent right of self-defense has been central to the Second Amendment right," the Court concluded, <u>id.</u> at 628, holding the Amendment protects at its core "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." <u>Id.</u> at 635.

Justice Scalia, writing for the majority, gave rough shape to the contours of the Second Amendment. "Like most rights, the right secured by the Second Amendment is not unlimited." <u>Id.</u> at 626.[9] Without undertaking "an exhaustive historical analysis . . . of the full scope of the Second Amendment," <u>id.</u>, the Court carved out from its protections a nonexhaustive list of "presumptively lawful regulatory measures" governing certain classes of people and categories of weapons. <u>Id.</u> at 627 n. 26.

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We also recognize another important limitation on the right to keep and carry arms. <u>Miller</u> said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

_____

[9] As our Court of Appeals observed, "There is some dispute over whether the language from <u>Heller</u> limiting the scope of the Second Amendment is dicta." <u>Marzzarella</u>, 614 F.3d at 90 n. 5. Nonetheless, our Court adopted the Supreme Court's guidance on the Amendment's limitations, reasoning, "There is dicta and then there is dicta, and then there is Supreme Court dicta." <u>Id.</u> (internal citation omitted). We take our Court of Appeals's point.

Id. at 626-27 (internal citations omitted). Reaffirming Miller, which upheld an NFA ban on transporting short-barreled shotguns, the Court described protected weapons as those with "some reasonable relationship to the preservation or efficiency of a well regulated militia." Id. at 622 (quoting Miller, 307 U.S. at 178). Heller reasoned that Second Amendment protection for weapons deemed "part of ordinary military equipment" under Miller must be read "in tandem with what comes after," that able-bodied men called for militia service would supply themselves with arms "in common use at the time," id. at 624 (quoting Miller, 307 U.S. at 179).

Without that limitation, Justice Scalia explained, Miller would define the Second Amendment's ambit to protect "only those weapons useful in warfare. . . . That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in Miller) might be unconstitutional, machineguns being useful in warfare in 1939." Id. Thus, the Court limited the Second Amendment to only include those weapons "typically possessed by law-abiding citizens for lawful purposes," id. at 625, dovetailed with the historical prohibition on "dangerous and unusual weapons."[10] Id. at 627.

Our Court of Appeals has several times considered the post-Heller scope of the Second Amendment and we rely on its guidance here.

In Marzzarella, a defendant indicted for possessing a handgun with an obliterated serial number challenged his Indictment as-applied under the Second Amendment. 614 F.3d at 88. Our Court of Appeals devised the two-part test to determine whether an individual's asserted right falls within the Amendment's ambit. As stated above,

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's

---

[10] Citing G. Heumann, Swords and Blades of the American Revolution (1973), Justice Scalia noted that militias brought weapons "used in defense of person and home [which] were one and the same." Heller, id. at 624-25.

> guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

614 F.3d at 89 (internal citation omitted).  Our Court of Appeals held that by linking "presumptively lawful regulators" with restrictions on dangerous and unusual weapons, "the [Supreme] Court intended to treat them equivalently -- as exceptions to the Second Amendment guarantee." Id. at 91. Countering the argument that any weapon possessed in the home for self-defense was protected under all circumstances, our Court of Appeals explained that "the Supreme Court has made clear the Second Amendment does not protect" possession of machine guns in the home.  Id. at 94 (citing Miller, 307 U.S. at 178, and United States v. Fincher, 538 F.3d 868, 874 (8th Cir. 2008) ( "Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use."), cert. denied, 129 S.Ct. 1369 (2009)).  A weapon is dangerous and unusual in part "because of its heightened capability to cause damage." Marzzarella, 614 F.3d at 95 (internal citations omitted).

In Barton, our Court of Appeals rejected the defendant's facial and as-applied Second Amendment challenge to the federal statute prohibiting firearm possession by a felon.  "The Supreme Court has twice stated that felon gun dispossession statutes are 'presumptively lawful,'" our Court of Appeals reasoned.  633 F.3d at 172 (citing Heller, 554 U.S. at 627 n. 26 and McDonald, 561 U.S. at 786).  Because Heller created a presumption that the prohibition lawfully placed the felon's conduct outside the scope of the Second Amendment's coverage, the Court held that the defendant's "facial challenge must fail."  Id.  Barton also considered whether the defendant could rebut that presumption by "present[ing] facts about himself and his background that distinguish his circumstances from those of persons historically barred from

31

Second Amendment protections."  Id. at 174.  Our Court of Appeals held that Barton failed to do

so.  Id.; cf. Britt v. State, 681 S.E.2d 320 (N.C. 2009) (past conviction for minor non-violent

crime no bar to firearm possession under North Carolina Constitution).

      Finally, our Court of Appeals held constitutional a New Jersey law requiring individuals

wanting a permit to carry handguns in public to show a "justifiable need to carry a handgun."

Drake, 724 F.3d at 428 (quoting New Jersey's Handgun Permit Law, N.J.S.A. § 2C:58-4(c)).

There, our Court of Appeals held the "justifiable need" requirement qualified as a

"presumptively lawful," "longstanding" regulation because it had been in effect in some form for

nearly ninety years and therefore "d[id] not burden conduct within the scope of the Second

Amendment."  Id. at 429, 432.  As a result, the majority reached only the first prong of

Marzzarella's two-step test.  Nonetheless, "because of the important constitutional issues

presented" by a handgun regulation that might burden conduct deemed within the Amendment's

scope, our Court of Appeals "believe[d] it to be beneficial and appropriate to consider whether

the 'justifiable need' standard" would withstand the applicable level of scrutiny, which it deemed

to be intermediate.  Id. at 430.[11]  "If the Second Amendment protects the right to carry a handgun

outside the home for self-defense at all, that right is not part of the core of the Amendment."  Id.

at 436 (internal citation omitted).  Our Court of Appeals held the State of New Jersey

successfully met all three prongs of intermediate scrutiny.  Id. at 436, 440 ("[U]nder intermediate

scrutiny the government must assert a significant, substantial, or important interest; there must

also be a reasonable fit between that asserted interest and the challenged law, such that the law

---

[11] Our Court of Appeals observed that Heller "makes clear that we may not apply rational basis review to a law that burdens protected Second Amendment conduct."  Drake, 724 F.3d at 436. At the other end of the spectrum, the Court considered that strict scrutiny offered an inappropriate scope of review when a regulation did not burden the core right of handgun possession for self-defense in the home.  Id. (internal citation and quotation marks omitted).

does not burden more conduct than is reasonably necessary.").

Reading our Court of Appeals's decisions together, we hold that Watson's Second Amendment challenge fails both facially and as-applied. The ban on machine guns outside the purely military context, like the felon dispossession statutes, is "presumptively lawful," as <u>Heller</u> held and as our Court of Appeals made pellucid in <u>Marzzarella</u>. We agree with the Government that there is <u>no</u> support in <u>Heller</u> for Watson's argument that the machine gun ban is an unconstitutional categorical prohibition because the weapon's military use "is a lawful purpose of firearm ownership." Br. in Opp. at 11. Whatever line divides machine guns from other destructive devices (such as anti-personnel mines, rocket-propelled grenades, and the like) is not of Second Amendment consequence. Rather, we return to Justice Scalia's distinction between arms "in common use" under Second Amendment protection and "those weapons useful in warfare" -- including machine guns -- which fall outside the Amendment's protection. <u>Heller</u>, 554 U.S. at 624. Neither Section 922(o) nor the NFA burden conduct covered under the Second Amendment's guarantee. Because the Second Amendment does not protect machine gun possession, Watson's facial challenge to Section 922(o) and the NFA must fail.

Because Watson offers no facts to distinguish <u>why</u> this presumptively lawful measure should not apply to him and his machine gun and Watson fails to distinguish his circumstances from conduct falling outside Second Amendment protection, his as-applied challenge must also fail.

Our inquiry ends at step one of the <u>Marzzarella</u> analysis and so we will grant the Government's motion as to Watson's Second Amendment claim. The difference between Watson's case and our Court of Appeals's reasoning in <u>Drake</u> confirms this reasoning. Here, as there, the existence of a long-established "presumptively lawful" statute confines our inquiry at

Marzzarella's step one.  But there, our Court of Appeals deemed means-end scrutiny an appropriate alternative because the extent of Second Amendment protection over a legitimate class of firearms (handguns) carried outside the home has as yet not been fully defined.  By contrast, the class of firearms at issue here is presumptively unlawful, whether carried inside or outside the home.  We find unpersuasive Watson's arguments that the post-1986 ban is not longstanding enough within the meaning of Heller when our Court of Appeals held that the Supreme Court made clear seventy-six years ago that the Second Amendment does not protect possession of machine guns  in the home.  Watson's contention that Heller limits "dangerous and unusual" weapons only to a threatening manner of carrying them ("affray") finds no support under Heller and, in any case, cannot overcome Heller's clear language placing machine guns among the "dangerous and unusual" firearms outside the Second Amendment's scope.  We therefore need not reach beyond step one of Marzzarella to engage in means-end analysis in order to find Watson's machine gun lies well outside the scope of the Second Amendment's coverage.

　　　　Our conclusion is fortified by the reasoning of other Courts of Appeals that have considered the machine gun ban.  In Fincher, the defendant contested his conviction for machine gun and shotgun possession by arguing that he had the right to possess the weapons under the Second Amendment "because his possession had some reasonable relationship to the maintenance of a well regulated militia."  538 F.3d at 870.  The Eighth Circuit disagreed.  Applying the recent Heller decision, the Court held:

> Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.

Id. at 874.

Similarly, in United States v. Henry, 688 F.3d 637 (9th Cir. 2012), a defendant appealed his conviction for illegal possession of a homemade machine gun under Section 922(o) -- one of the provisions Watson contests. The Ninth Circuit observed that "Heller did not specify the types of weapons that qualify as 'dangerous and unusual,' but that Court held that it would be 'startling' for the Second Amendment to protect machine guns." Henry, 688 F.3d at 640. Reviewing the roots of the machine gun in World War I combat, the capacity of modern machine guns to fire more than 1,000 rounds per minute, and the fact that private possession has been banned since 1986, the Ninth Circuit "agreed with the reasoning of [its] sister circuits that machine guns are 'dangerous and unusual weapons' " outside the Second Amendment's protection. Id. (citing cases).

We will therefore grant the Government's motion to dismiss as to Watson's Second Amendment claim.

**E.    Watson's Commerce Clause Challenge**

We turn next to Watson's argument that, because machine guns have no substantial effect on interstate commerce, Congress lacked constitutional power to enact Section 922(o) and its accompanying regulations. Compl. at ¶ 60.

The Government argues that the Supreme Court, our Court of Appeals and other Courts of Appeal that have considered the issue have repeatedly held that this prohibition falls within the "purely intrastate activities" that affect interstate commerce and are therefore within Congress's power to regulate. MTD at 27 (citing United States v. Rybar, 103 F.3d 273 (3d Cir. 1996) (affirming conviction for machine-gun possession against Commerce Clause challenge)). Most recently, the Supreme Court held that Congress may regulate "purely local activities" that are part of a "class of activities" that have a substantial effect on interstate commerce. Id. (citing

Gonzales v. Raich, 545 U.S. 1, 17 (2005) (internal citation and quotation marks omitted)).  Any

such regulation need meet only a rational basis test.  Id. at 28 (quoting Raich, 545 U.S. at 22).

The Government points us to several Court of Appeals decisions applying Raich to uphold

federal firearms laws.  Id.  See United States v. Stewart, 451 F.3d 1071 (9th Cir. 2006); see also

Montana Shooting Sports Ass'n v. Holder, 727 F.3d 975 (9th Cir. 2013); accord United States v.

Rene E., 583 F.3d 8 (1st Cir. 2009), United States v. Rose, 522 F.3d 710 (6th Cir. 2008).

Watson responds in opposition that Raich rests on Congress's rational basis for regulating

intrastate manufacture and possession of marijuana as part of its larger regulatory goal to prohibit

the interstate drug trade as enacted in the Controlled Substances Act ("CSA").  Br. in Opp. at 27.

In contrast, he contends that "Heller declared beyond a doubt that Congress cannot outright

prohibit firearms."  Id.  He contests the Government's assertion that Section 922(o) is part of a

larger regulatory scheme to keep firearms out of the hands of those not legally entitled to possess

them because Congress has made no such findings and the Government's briefs fail to show how

machine gun possession by law-abiding citizens undermines Congressional efforts with respect

to proscribed persons.  Id. at 28.  He also asserts that Congressional findings before the 1986 ban

fail to include any facts bearing on interstate commerce -- except for the then-ATF Director's

statement that "machine guns which are involved in crimes are so minimal so as not to be

considered a law enforcement problem."  Id. at 29 (quoting Armor Piercing Ammunition and the

Criminal Misuse and Availability of Machineguns and Silencers: Hearings on H.R. 641 and

Related Bills Before the Subcomm. On Crime of the House Com. on the Judiciary, 98th Cong.

208 (1986)).

Watson treads a path others have taken before and reached the same end:  There is no

doubt, under our Court of Appeals's twenty year-old Rybar decision and the Supreme Court's

36

A36

Raich decision since, that Congress acted well within its Commerce Clause powers when

prohibiting machine gun manufacture and possession.

In Rybar, a machine gun dealer sought to challenge Section 922(o) in the wake of United

States v. Lopez, 514 U.S. 549 (1995), which limited Congress's Commerce Clause power.  Our

Court of Appeals applied a two-part test, determining first that "Congress could rationally

conclude that the regulated activity substantially affects interstate commerce," and, next, that

Congress's means are "reasonably adapted to the end permitted by the Constitution."  Rybar, 103

F.3d at 278.  Surveying the extensive history of Congressional firearm regulation from the NFA

in 1934, to the 1968 enactment of the Omnibus Crime Control and Safe Streets Act incorporating

the Federal Firearms Act, to the GCA later that year -- statutes Watson also challenges -- our

Court of Appeals observed of the 1986 legislative focus on machine guns that

> [b]y the time Congress passed the [Act] of which § 922(o) is a
> part[,] it had already passed three firearm statutes under its
> commerce power based on its explicit connection of the interstate
> flow of firearms to the increasing serious violent crime in this
> country, which Congress saw as creating a problem of national
> concern.

Id. at 281 (internal quotation marks omitted).  Against that legislative backdrop, our Court of

Appeals found no obligation that Congress must make specific findings linking machine guns to

interstate commerce because Congress could have reasonably concluded that a general ban

would meaningfully impact interstate commerce.  Contrary to Watson's argument that Congress

may not ban machine guns because it failed to make specific findings identifying indicia of

interstate commerce, our Court of Appeals concluded that "Congress' intent to regulate

possession and transfer of machine guns as a means of stemming interstate gun trafficking is

manifest."  Id. at 282.

Rejecting the appellant's view, which Watson also advances, that the non-commercial

37

A37

intrastate manufacture of machine guns would not undercut Congress's goal, our Court of Appeals also observed, "Supreme Court cases have long sustained the authority of Congress to regulate singular instances of intrastate activity when the cumulative effect of a collection of such events might ultimately have substantial effect on interstate commerce." Id. at 283.[12]  Our Court of Appeals thereby joined five other Circuits in rejecting the Commerce Clause challenge to Section 922(o).

The prohibition upheld in Raich only reinforces that holding.  In that case, the Supreme Court held that under the Commerce Clause Congress may criminalize the production and consumption of home-grown marijuana under the Controlled Substances Act even when states approve it for medicinal use.  The Supreme Court identified three broad areas where Congress may regulate under its expansive Commerce Clause power.

> First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce.

Raich, 545 U.S. at 16-17 (internal citation omitted).  Applying the third prong, the Supreme Court held that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." Id. at 18 (citing Wickard v. Filburn, 317 U.S. 111, 127-28 (1942)).  Raich reaffirmed that "the absence of particularized findings does not call into question Congress' authority to legislate." Id. at 21.  More to the point here, the Supreme Court rejected any argument that Congress lacks power to prohibit commerce

---

[12] Accord United States v. Kenney, 91 F.3d 884 (7th Cir. 1996).  See also United States v. Beuckelaere, 91 F.3d 781 (6th Cir. 1996); United States v. Rambo, 74 F.3d 948 (9th Cir. 1996); United States v. Kirk, 70 F.3d 791 (5th Cir. 1995); and United States v. Wilks, 58 F.3d 1518 (10th Cir. 1995), sustaining Section 922(o) as a proper exercise of Congress' commerce power.

in a particular commodity, which is important in view of Watson's claim that "Heller declared beyond a doubt that Congress cannot outright prohibit firearms."  Br. in Opp. at 27.  To the contrary, "[i]t has long been settled that Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity." Raich at 19 n. 29 (citing Lopez, 514 U.S. at 571 (Kennedy, J., concurring)).   Heller does not change that.

Although our Court of Appeals has not revisited Rybar in light of Raich, other Courts of Appeals have concluded that Raich upholds Congress's power to ban machine guns.  The Ninth Circuit sustained Section 922(o) against a Commerce Clause challenge concluding that "Congress had a rational basis for concluding that in the aggregate, possession of homemade machineguns could substantially affect interstate commerce in machineguns because [they]. . . can enter the interstate market and affect supply and demand."  Henry, 688 F.3d at 641 (quoting Stewart, 451 F.3d at 1078) (internal quotation marks omitted).  "Every other circuit that has reached the issue has similarly held that § 922(o) is constitutional under the Commerce Clause." Id. (citing cases).

In light of the well-established holdings by our Court of Appeals and other circuits that Congress did not exceed its Commerce Clause power when it prohibited machine gun manufacture and possession, both Watson's facial and as-applied challenges to the NFA and Section 922(o) must fail.  We therefore grant the Government's motion to dismiss as to this Count.

### F.   Watson's Due Process Challenge

We consider next Watson's claim that the BATFE violated his Due Process rights by revoking the issued tax stamp and approval of ATF Form 1 and then requiring him to surrender the machine gun.

39

A39

The Due Process Clause of the Fifth Amendment states no one shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Procedural due process inquiries proceed in two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (internal citations omitted). As the Supreme Court has long held, "Property interests . . . are not created by the Constitution. Rather they are created . . . by existing rules or understandings that stem from an independent source." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); see also Abbott v. Latshaw, 164 F.3d 141, 146 (3d Cir. 1998) ("[P]rocedural due process is implicated only where someone has claimed that there has been a taking or deprivation of a legally protected liberty or property interest.")

The Government argues that there is no need for us to go beyond the first step because Watson had no property interest in his illegal machine gun that he "manufactured after ATF's erroneous approval of [his] ATF Form 1." MTD at 30. The ministerial error that led to that approval, the Government maintains, does not create a property interest. Id. The Government contends that the GCA's prohibition on machine guns not lawfully possessed or registered before 1986 is fatal to Watson's claim because a protected property interest requires a "legitimate claim of entitlement." Id. at 31 (quoting Roth, 408 U.S. at 577). "[B]ecause a machine gun constitutes obvious contraband under Federal law, [Watson] cannot seriously argue that he had a protected property interest in the weapon he manufactured." Id. (internal citations and quotation marks omitted). Nor does Watson's machine gun bear any property interest commonly associated with property, as federal firearms laws prohibit Watson from selling, assigning, or transferring his machine gun. Id. at 33.

40

By the same token, the Government argues, Watson cannot establish a protected property interest in an erroneously approved application.  Id.  The Government concedes that issuance of an administrative approval can create a protected property interest, but only when the "continued possession" of that approval "become[s] essential in the pursuit of a livelihood."  Id. at 33 (quoting Bell v. Burson, 402 U.S. 535, 539 (1971)).  But Watson does not here allege he intended his machine gun making to constitute any "livelihood."  Id.  The Government contends that because Section 922(o) prohibits possession of machine guns, only governmental entities' applications may be approved pursuant to the NFA, 26 U.S.C. § 5861(f).  Id. at 32.

Finally, the Government states that (1) counter to Watson's allegation that the ATF lacks the authority to revoke authorization, that Agency may, of its own initiative, undo what has been improvidently done, id. at 32 n. 20, and (2) even if Watson had a cognizable property interest, his post-deprivation remedy was not "constitutionally inadequate" because the ATF reversed its approval quickly, thereby preventing the mistaken manufacture of an additional weapon and giving Watson the chance to reapply if he believed the decision to be in error.  Id. at 34 n. 21.

Watson responds in opposition that the Government overlooks the fact that the Trust, also a party to this action, received approval to make the machine gun.  Br. in Opp. at 30.  He argues that the Trust "is not subject to the provisions of [Section] 922(o) under the plain language of the law," and is thus "permitted to manufacture or possess a machine gun manufactured after 1986, so long as the Trust complies with the provisions of the NFA."  Id. at 31.  Watson maintains that the Trust has a "legitimate claim of entitlement" to the machine gun and the Government had no legal basis on which to deny the Form 1 once approved.  Id.  He also argues that his ability to "possess and use the machine gun and exclude others from its use" without the Government's intervention creates a protectable property interest in both the firearm and the approved Form 1.

41

A41

Id. at 32.

Watson also scoffs at the idea that the Government provided any post-deprivation remedy. Id. He contends that he has adequately pled a Fifth Amendment claim for relief because the Trust had a property interest in the confiscated firearm and the Form 1. Id. at 32, 33.

In reply, the Government argues that the plaintiff's Trustee status is beside the point because Watson's constitutional claims rest on the statutory text of Section 922(o) and his pleadings do not identify anyone who was treated differently. Reply at 9. Watson's "attempt[] to construe the NFA's definition of 'person' to place the trustees of unincorporated trusts beyond the scope of firearms regulations" is an "idiosyncratic interpretation" that cannot prevail when machine guns are "obvious contraband." Id. at 10. As the ATF explained in its letter to Watson, attached to his Complaint, "transfer of an NFA firearm to a trustee. . . is made to this person as an individual (i.e. not as a trust)." Id.; see also Compl. at Ex. A. The Government contends the Agency's authoritative interpretation governs because it is consistent both with the Restatement (3d) of Trusts § 2 (2003) -- which states that a Trust is not a legal person capable of owning property -- and with "Congress's intent to prohibit the post-1986 manufacture of machine guns" except as specifically permitted. Id. at 10.

We address first Watson's contention that the Trust's exclusion from Section 922(o)'s definition of a "person" must limit that statute's reach. It is well-established that a trust is not a legal "person" but rather a legal term for a relationship having certain characteristics. See 1 Restatement (Third), Trusts § 2 (2003); see also G. Bogert & A. Hess, 1 Trusts and Trustees (3d ed. 2007) § 1. A Trust "is not an entity distinct from its trustees and capable of legal action on its own behalf" but merely represents "a fiduciary relationship with respect to property." 76 Am. Jur. 2d Trusts § 3 (2015). It cannot contract or own property. Id. Watson's contention that the

42

A42

Trust acted to file the Form 1 and has possession of the machine gun is neither legal fact nor legal fiction, but legal nullity.  Thus, we disregard Watson's argument that the Trust had any property interest in either the Form 1 or the machine gun.  It did not because it could not.

As to Watson himself, we agree with the Government that Watson has no legally protected interest in either the Form 1 or the machine gun.  As the Supreme Court explained in Roth, to have a protected property interest, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  408 U.S. at 577.  But no legitimate entitlement can arise when possession of the property at issue is expressly forbidden.  Despite Watson's assertion of certain property rights, such as his ability to use the machine gun and exclude others from using it, the most basic right -- to possess the machine gun -- remains illegal.

Likewise, Watson has no legitimate claim of entitlement to his Form 1. The Supreme Court in Burson considered a Georgia law under which an uninsured motorist's driver's license would be suspended unless he could post security for the amount of damages claimed by another party to the accident.  The pre-suspension procedures excluded considerations of fault or responsibility, yet "[o]nce licenses are issued,. . . their continued possession may become essential in the pursuit of a livelihood." 402 U.S. at 539.  The Court held that

> Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.

Id.  We agree with the Government that Watson has no entitlement to procedural due process on the revocation of the Form 1.  Contrary to Burson, where pre-deprivation due process is needed to protect a legitimate interest, Watson has no legitimate "important interests" in the Form 1.  While the Supreme Court held that procedural due process was needed to safeguard an

43

important, perhaps essential, right, Watson cannot claim his alleged entitlement to the Form 1

constitutes such a right when only governmental entities' applications for machine guns may be

approved pursuant to the NFA.  That the agency charged with administering the firearms statutes

erred in approving the Form 1 is of no moment because the GCA and NFA expressly prohibit

making or possessing such a firearm in all instances save in an approved official capacity.  See

18 U.S.C. § 922(o)(2)(A) and (B); see also 26 U.S.C. § 5822(e) ("Applications shall be denied if

the making or possession of the firearm would place the person making the firearm in violation

of law.").  Watson manifestly also did not rely on the Form 1 for his livelihood.

    Because Watson has no cognizable interest in either the Form 1 or the machine gun, we

conclude the procedural due process inquiry at the first step and so need not examine whether the

procedures before or after the deprivation were constitutionally sufficient.

    We will therefore grant the Government's motion to dismiss Watson's Due Process

claim.

### G.    Watson's Equal Protection and Detrimental Reliance Claims

    Lastly, we consider Watson's Equal Protection and detrimental reliance claims.

    The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall

. . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const.

amend. XIV, § 1.  The Supreme Court has held this protection is encompassed in the Fifth

Amendment's Due Process Clause and therefore applies to the federal government.  Bolling v.

Sharpe, 347 U.S. 497 (1954).

    The Government contends, first, that Watson's claim upon "information and belief" that

the ATF "approved the manufacture and transfer of post-1986 machine guns to various

individuals" -- which he characterized as a denial of equal protection -- fails to meet the pleading

standards Iqbal and Twombly impose because it does not include "factual content that allows the court to draw the reasonable inference that [the Government] is liable for the misconduct alleged." MTD at 35 (quoting Iqbal, 556 U.S. at 678). The Government next contends that we draw upon our "judicial experience and common sense," id. (quoting Iqbal, 556 U.S. at 678-79), to hold that Watson has not begun to make a legitimate equal protection claim by not alleging that any distinction between him and those allegedly permitted to make machine guns rests on his membership in a suspect class. Id. "Absent such an allegation," we must evaluate an equal protection claim under rational basis scrutiny. Id. (citing Mabey Bridge & Shore, Inc. v. Schoch, 666 F.3d 862, 876 (3d Cir. 2012)). The Government argues that it may permissibly distinguish between Watson and other applicants "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes" that the Government's actions must be irrational. Id. (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000)).

As to Watson's claim that the ATF should be estopped from revoking its approval of his Form 1 -- which the Government characterizes as equitable estoppel or detrimental reliance -- it contends that no such claim can "lie against the Government as it lies against private litigants." Id. at 36 (quoting Office of Pers. Mgmt. (OPM) v. Richmond, 496 U.S. 414, 419 (1990). Obedience to the rule of law would be undermined if the Government were unable to enforce a law because its agents' action gave rise to an estoppel. Id. See also Heckler v. Cmty. Health Servs., 467 U.S. 51, 60 (1984).

An estoppel claim requires a plaintiff to prove (1) misrepresentation by the other party, (2) on which he reasonably relied, (3) to his detriment." MTD at 37; see also United States v. Asmar, 827 F.2d 907, 912 (3d Cir. 1987). In claims against the Government, a plaintiff must

45

also prove "affirmative misconduct." Id. (citing Asmar, 827 F.2d at 912).  The Government

contends that Watson can at best show the ATF examiner who approved the application acted in

error, under a mistaken belief Watson presented valid grounds to modify the machine gun -- a

mistake that falls well short of affirmative misconduct.  Id.  It also claims "it is questionable

whether" Watson can show any legitimate reliance.  Id. at 37 n. 22.[13]

Watson responds in opposition that the proper standard for evaluating his Equal

Protection claim is strict scrutiny, not rational basis, because the right to keep and bear arms is a

fundamental right.  Br. in Opp. at 33 (citing McDonald, 561 U.S. at 778).  Therefore, he argues,

the Government must show that it had a compelling interest to treat him differently than those

who he alleges were approved.  Id.  He contends he has met the Iqbal/Twombly pleading

standard and should therefore survive the Government's motions to dismiss and for summary

judgment.  Id.

As to his detrimental reliance claim, Watson rejects the Government's description of the

Form 1 approval as "mistake" or "error," because (1) his second Form 1 had been approved then

disapproved and (2) a plaintiff in another matter also received approval.  Id. at 35.  "Quite

clearly, [the Government] had [an imagined] concerted plan . . . to approve Form 1 applications"

such as his "which were submitted by trusts. . . and later changed course."  Id.  He argues that the

Agency's claimed approvals, which put the Government in violation of federal law and its own

---

[13] The Government also cites F.J. Vollmer Co. v. Higgins, 23 F.3d 448 (D.C. Cir. 1994), where
the D.C. Circuit rejected a machine gun maker's detrimental reliance contention that he
erroneously relied on an ATF letter advising him that he could legally modify a gun to make it
into a machine gun.  Id. at 37.  The Court held the letter's "general statements" did not represent
"the sort of affirmative misconduct required to estop the government from enforcing its laws."
Higgins, 23 F.3d at 450 (quoted in MTD at 38).

regulations, constitutes the requisite "affirmative misconduct." <u>Id.</u> at 35, 36.[14] He contends that granting him relief would not undermine the rule of law because the Government has explicit authority to register even an unlawfully possessed machine gun. <u>Id.</u> at 37 (citing 27 C.F.R. § 479.101(b)).

In reply, the Government states that its established interpretation of regulations prohibiting private possession of machine guns precludes Watson's detrimental reliance claim. Reply at 11.[15]

We will not tarry over the Government's argument that Watson's Equal Protection's claim falls short of pleading standards by relying upon "information and belief." "[A]llegations in this form have been held to be permissible, even after the <u>Twombly</u> and <u>Iqbal</u> decisions." 5 Wright, Miller & Kane, <u>Federal Practice & Procedure</u> § 1224 (3d ed. 2015). This form of pleading finds its parallel in Rule 8(b)'s provision that a responding party may state he is "without knowledge or information" concerning the truth of an averment. <u>Id.</u>; <u>see</u> <u>also</u> Fed. R. Civ. P. 8(b)(5).[16]

---

[14] Watson argues <u>Higgins</u> is readily distinguishable because unlike Higgins's reliance on his own interpretation of the ATF's statements in a letter, Watson relied on official approval. Br. in Opp. at 36.

[15] The Government also draws our attention to Exhibit A of Watson's Complaint (a March 17, 2014 letter to another entity, not a party to this litigation, which sets forth the Government's interpretation of "person" to exclude unincorporated trusts) and Watson's submission of his second Form 1 on June 24, 2014 -- more than three months later -- which received the erroneous Agency approval on August 5, 2014. Reply at 11 (citing Compl. at ¶ 38, 39).

[16] "Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." 5 Wright, Miller & Kane, <u>Federal Practice & Procedure</u> § 1224 (3d ed. 2015). It bears mention that certain fraud allegations that have a heightened pleading standard may not be pled on information and belief. <u>See</u> <u>United States ex rel. Knisely v. Cintas Corp, Inc.</u> 298 F.R.D. 229, 241 (E.D. Pa. 2014) (Dalzell, J.)

47

As to the substance of Watson's Equal Protection claim, he alleges, without bothering to elaborate or identify anyone, that others received permission to make or possess machine guns. Compl. at ¶ 76.  To prevail, Watson must show that any classification at issue "proceeds along suspect lines" or "infringes fundamental constitutional rights."  FCC v. Beach Commc'ns, 508 U.S. 307, 313 (1993).  Watson argues that permitting [unnamed] others to possess post-1986 machine guns infringes on his fundamental constitutional right to bear arms.  As we have already disposed of that constitutional claim, we hold it cannot support Watson's Equal Protection claim. He does not and cannot allege that any distinction rested on a suspect class.  Thus, the Government may treat others more favorably than Watson "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," Mabey Bridge, 666 F.3d at 876.  We agree with the Government that Watson has not explained who has been treated more favorably.

Finally, we consider Watson's detrimental reliance claim.  As stated above, he must show (1) the Government's misrepresentation, (2) on which he reasonably relied, (3) to his detriment, and the Government's "affirmative misconduct" caused him cognizable legal harm.  Mudric v. Attorney General of the United States, 469 F.3d 94, 99 (3d Cir. 2006).

We agree that Watson cannot make out a detrimental reliance claim because he cannot show that his reliance on the approval of his Form 1 was to his detriment.  To begin with, "[w]hen a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position."  Heckler, 467 U.S. at 62.  But here, as in Heckler (where a health care provider challenged the attempted recoupment of Medicare overpayments), Watson "lost no rights," id., because, as shown at length above, Watson has no right to make or own a machine gun. He "cannot raise an estoppel" claim without showing he is "significantly

48

worse off" than he would have been if he had never received the BATFE approval.  Id. at 63.

And we agree with the Government that the erroneous approval does not rise to the level of

"affirmative misconduct."  Our Court of Appeals has held that "affirmative misconduct" requires

something far more than mere negligence.  Mudric, 469 F.3d at 99.  See also Schweiker v.

Hansen, 450 U.S. 785, 788 (1981) ("Lower federal courts have . . . consistently refus[ed] to estop

the Government where an eligible applicant has lost Social Security benefits because of possibly

erroneous replies to oral inquiries.") (citing cases).

We will therefore grant the Government's motion to dismiss Watson's Equal Protection

and detrimental reliance claims.

**V.**       **Conclusion**

For the reasons articulated above, we hold that Watson has standing to bring his

constitutional challenges to the NFA and GCA.  But we will nevertheless grant the

Government's motion to dismiss his complaint because (1) the Second Amendment does not

protect the manufacture and possession of machine guns, and (2) Congress acted well within its

established Article I Commerce Clause power to enact the machine gun bans, as we hold above.

Additionally, Watson's Due Process claim must also be dismissed because he cannot show that

he had a legitimate claim of entitlement in either the machine gun or an approved application.

Finally, we also grant the Government's motion to dismiss Watson's Equal Protection and

detrimental reliance claims.

An appropriate Order follows.

BY THE COURT:

    /s/ Stewart Dalzell, J.
Stewart Dalzell, J.

49

A49

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ONE PALMETTO STATE ARMORY | : | NO. 15-2202 |
| PA-15 MACHINEGUN RECEIVER/FRAME, | : | (consolidated) |
| UNKNOWN CALIBER, SERIAL NUMBER | : | |
| LW001804, defendant | : | |
| And | : | |
| WATSON FAMILY GUN TRUST, claimant | : | |

## ORDER

AND NOW, this 22nd day of July, 2015, upon consideration of defendants Loretta Lynch

and Thomas E. Brandon's (collectively, "the Government") motion to dismiss, or in the

alternative, motion for summary judgment (docket entry # 10) and plaintiff Watson's response

thereto, it is hereby ORDERED that:

1.    Defendants' motion for leave to file a reply is GRANTED;

2.    Plaintiff's motion for leave to file a surreply is GRANTED;

3.    Defendants' motion to dismiss or, in the alternative, for summary judgment is

GRANTED IN PART and DENIED IN PART;

4.    Defendants' motion to dismiss Watson's Second Amendment and Commerce

Clause claims for lack of subject matter jurisdiction is DENIED;

5.    Defendants' motion to dismiss Watson's complaint pursuant to 12(b)(6) is

GRANTED; and

6.    By noon on August 10, 2015, the parties shall FILE any motions, not to exceed

A50

ten pages, in the forfeiture action concerning the disposition of the Palmetto State Armory PA-15

machine gun receiver/frame.

BY THE COURT:

   /s/ Stewart Dalzell, J.
Stewart Dalzell, J.

51

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ONE PALMETTO STATE ARMORY | : | NO. 15-2202 |
| PA-15 MACHINEGUN RECEIVER/FRAME, | : | (consolidated) |
| UNKNOWN CALIBER, SERIAL NUMBER | : | |
| LW001804, defendant | : | |
| And | : | |
| WATSON FAMILY GUN TRUST, claimant | : | |

<u>ORDER</u>

AND NOW, this 22nd day of July, 2015, upon consideration of defendants Loretta Lynch

and Thomas E. Brandon's (collectively, "the Government") motion to dismiss, or in the

alternative, motion for summary judgment (docket entry # 10) and plaintiff Watson's response

thereto, it is hereby ORDERED that:

1.    Defendants' motion for leave to file a reply is GRANTED;

2.    Plaintiff's motion for leave to file a surreply is GRANTED;

3.    Defendants' motion to dismiss or, in the alternative, for summary judgment is

GRANTED IN PART and DENIED IN PART;

4.    Defendants' motion to dismiss Watson's Second Amendment and Commerce

Clause claims for lack of subject matter jurisdiction is DENIED;

5.    Defendants' motion to dismiss Watson's complaint pursuant to 12(b)(6) is

GRANTED; and

6.    By noon on August 10, 2015, the parties shall FILE any motions, not to exceed

A52

ten pages, in the forfeiture action concerning the disposition of the Palmetto State Armory PA-15

machine gun receiver/frame.

BY THE COURT:

___/s/ Stewart Dalzell, J.
Stewart Dalzell, J.

A53

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.2:15-cv-2202-SD |
| | ) | (consolidated with 2:14-cv-6569-SD) |
| ONE PALMETTO STATE ARMORY | ) | |
| PA-15 MACHINEGUN RECEIVER/FRAME) | | |
| UNKNOWN CALIBER, SERIAL NUMBER ) | | |
| LW001804, Defendant | ) | |
| | ) | |
| And | ) | |
| | ) | |
| WATSON FAMILY GUN TRUST, | ) | |
| Claimant | ) | |
| | ) | |

---

**NOTICE OF APPEAL**

---

PLEASE TAKE NOTICE that Plaintiff Ryan S. Watson Individually and as Trustee of the

Watson Family Gun Trust, by and through undersigned counsel, hereby appeals to the United

States Court of Appeals for the Third Circuit from the Court's Opinion and Order entered July 22,

2015 [ECF Nos. 6, 7].

Dated: August 1, 2015.

Respectfully submitted,

_/s/ Stephen D. Stamboulieh_____
STEPHEN D. STAMBOULIEH
ATTORNEY FOR PLAINTIFF

**Of Counsel:**

David R. Scott
Law Offices of J. Scott Watson, P.C.
24 Regency Plaza
Glen Mills, PA  19342

A54

(610) 358-9600
PA Bar No. 313491

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
Admitted Pro Hac Vice

Alan Alexander Beck
Law Office of Alan Beck
4780 Governor Drive
San Diego, CA  92122
(619) 971-0414
alan.alexander.beck@gmail.com
Admitted Pro Hac Vice

### CERTIFICATE OF SERVICE

I, Stephen D. Stamboulieh, hereby certify that the above Notice of Appeal has been filed

electronically with the Clerk of this Court, which sends notification of such filing to all counsel of

record in this case.

/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
MS Bar No. 102784
Admitted Pro Hac Vice

A56

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ONE PALMETTO STATE ARMORY | : | NO. 15-2202 |
| PA-15 MACHINEGUN RECEIVER/FRAME, | : | (consolidated with No. 14-6569) |
| UNKNOWN CALIBER, SERIAL NUMBER | : | |
| LW001804, defendant | : | |
| And | : | |
| WATSON FAMILY GUN TRUST, claimant | : | |

FILED

AUG 1 3 2015

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

ORDER

AND NOW, this 13th day of August, 2015, upon consideration of the claimant Ryan S.

Watson's unopposed motion for certification of entry of final judgment pursuant to Fed. R. Civ.

P. 54(b) (docket no. 13), and the Court finding that:

(a)     On June 22, 2015, we granted claimant's uncontested motion to consolidate this

forfeiture action with the first-filed action, and on July 22, 2015 we granted the defendants'

motion to dismiss the complaint in the first-filed action;

(b)     On August 6, 2015, we granted the parties' joint motion to stay the forfeiture

proceedings in this matter pending appeal;

(c)     On August 10, 2015, the Clerk of the Third Circuit Court of Appeals advised the

appellant that our July 22, 2015 Order was "not final within the meaning of 28 U.S.C. § 1291

and not otherwise appealable at this time" because the forfeiture action was still ongoing, Mot. at

¶ 8; see also Ex. A;

(d)     Rule 54(b) provides in relevant part that

> When an action presents more than one claim for relief—whether
> as a claim, counterclaim, crossclaim, or third-party claim—or
> when multiple parties are involved, the court may direct entry of a

final judgment as to one or more, but fewer than all, claims or
parties only if the court expressly determines that there is no just
reason for delay;

(e)    Our Court of Appeals has explained that "[o]btaining a final judgment cures the

jurisdictional defect of an otherwise premature appeal," In re Fosamax (Alendronate Sodium)

Products Liability Litigation (No. II), 751 F.3d 150, 156 (3d Cir. 2014) (internal citation

omitted); see also Cape May Greene, Inc. v. Warren, 698 F.2d 179, 185 (3d Cir. 1983) ("[A]

premature appeal taken from an order which is not final but which is followed by an order that is

final may be regarded as an appeal from the final order in the absence of the showing of

prejudice to the other party") (internal citation and quotation marks omitted) (emphasis in

original);

(f)    To certify our July 22, 2015 Order as final, we must find that there has been a

final judgment on the merits, see Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 7-8

(1980), and that there is no just reason for delay, see Allis-Chalmers Corp. v. Phila. Elec. Co.,

521 F.2d 360, 364 (3d Cir. 1975);

(g)    As we granted defendants' motion to dismiss, our Order was a final judgment on

the merits of claimant's complaint;

(h)    As to the second factor, our Court of Appeals teaches that we "should clearly

articulate the reasons and factors underlying its decision to grant 54(b) certification.  It is

essential that a reviewing court have some basis for distinguishing between well-reasoned

conclusions arrived at after a comprehensive consideration of all relevant factors, and mere

boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts

or analysis of the law," Allis-Chalmers Corp., 521 F.2d at 364 (internal citations, quotation

marks and ellipses omitted);

A58

(i)    Our "brief reasoned statement," id., should include consideration of the following

factors:

> (1) the relationship between the adjudicated and unadjudicated
> claims; (2) the possibility that the need for review might or might
> not be mooted by future developments in the district court; (3) the
> possibility that the reviewing court might be obliged to consider
> the same issue a second time; (4) the presence or absence of a
> claim or counterclaim which could result in set-off against the
> judgment sought to be made final; (5) miscellaneous factors such
> as delay, economic and solvency considerations, shortening the
> time of trial, frivolity of competing claims, expense, and the like,

id.;

(j)    As the claimant made clear in his August 3, 2015 motion to stay the forfeiture

proceedings, the claims are linked because he has stipulated that if his appeal is unsuccessful, he

will not contest forfeiture, Mot. at ¶ 17;

(k)    He argues, and we agree, that the second factor weighs in his favor because there

will be no further proceedings before us if his appeal is unsuccessful, id. at ¶ 18;

(l)    As claimant has conceded forfeiture in the event of an unsuccessful appeal, the

reviewing court will not be obliged to consider the same issue a second time;

(m)    There is no claim or counterclaim that would undermine the judgment he seeks to

make final and the last factor also weighs in his favor as it is efficient for our Court of Appeals to

consider the appeal of our July 22, 2015 Order now rather than oblige the parties to litigate a

largely redundant forfeiture action before presenting the identical or near-identical issues on

appeal;

(n)    We agree with the claimant's unopposed argument that there is no just reason for

further delay of entry of a final judgment; and

(o)    We find that there has been a final judgment on the merits;

3

A59

It is hereby ORDERED that claimant's motion for entry of final judgment pursuant to Fed. R. Civ. P. 54(b) is GRANTED.

BY THE COURT:

Stewart Dalzell, J.

A60

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA            :          CIVIL ACTION
                                                       :
            v.                                     :
                                                       :
ONE PALMETTO STATE ARMORY          :          NO. 15-2202
PA-15 MACHINEGUN RECEIVER/FRAME, :          (consolidated with No. 14-6569)
UNKNOWN CALIBER, SERIAL NUMBER   :
LW001804, defendant                        :
And                                             :
WATSON FAMILY GUN TRUST, claimant   :

JUDGMENT

        AND NOW, this 13th day of August, 2015, in accordance with the accompanying Order

and our July 22, 2015 Memorandum and Order in Civil Action 14-6569 granting defendants

Loretta Lynch and Thomas E. Brandon's (collectively, "the Government") motion to dismiss

plaintiff Watson's complaint in that action, JUDGMENT IS ENTERED in Civil Action 14-6569

in favor of Loretta Lynch and Thomas E. Brandon and against Ryan S. Watson, individually and

as Trustee for the Watson Family Gun Trust.

                                    BY THE COURT:


                                    __/s/ Stewart Dalzell, J.
                                    Stewart Dalzell, J.

A61