No. 15-2859

**In the**
**United States Court of Appeals for the Third Circuit**

UNITED STATES OF AMERICA,
v.

ONE PALMETTO STATE ARMORY PA-15 MACHINEGUN RECEIVER/FRAME
UNKNOWN CALIBER, SERIAL NUMBER LW001804; WATSON FAMILY GUN TRUST,
*Claimant,*

RYAN S. WATSON, INDIVIDUALLY AND AS
TRUSTEE OF THE WATSON FAMILY GUN TRUST,
*Appellant*,
v.

ATTORNEY GENERAL UNITED STATES OF AMERICA, *et al.*,
*Appellee.*

**On Appeal from the United States District Court**
**for the Eastern District of Pennsylvania**

**Brief *Amicus Curiae* of Gun Owners of America, Inc.,**
**Gun Owners Foundation, Gun Owners of California, Inc.,**
**The Heller Foundation,**
**Conservative Legal Defense and Education Fund,**
**and Institute on the Constitution in Support of Appellant and Reversal**

ROBERT J. OLSON*
WILLIAM J. OLSON
HERBERT W. TITUS
JEREMIAH L. MORGAN
JOHN S. MILES
  WILLIAM J. OLSON, P.C
  370 Maple Avenue W., Suite 4
*Attorney of Record          Vienna, VA  22180-5615
December 9, 2015              (703) 356-5070
                             *Attorney for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 3rd

Circuit Rule 26.1.1, it is hereby certified that *amici curiae* Gun Owners of

America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., The

Heller Foundation, and Conservative Legal Defense and Education Fund are non-

stock, nonprofit corporations, have no parent companies, and no person or entity

owns them or any part of them.  *Amicus curiae* Institute on the Constitution is not

a publicly traded corporation, nor does it have a parent company which is a

publicly traded corporation.

  /s/ Robert J. Olson            
Robert J. Olson
Attorney of Record for *Amici Curiae*

i

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Interest of the *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument

I.    THE DISTRICT COURT WRONGLY TREATED APPELLANT'S CLAIM AS
      FORECLOSED BY <u>MARZZARELLA</u> AND <u>HELLER</u>. . . . . . . . . . . . . . . . . . . . . 2

      A.    <u>Marzzarella</u> Misrepresented the Authorities Relied Upon to
            Uphold the Machinegun Ban. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The District Court Misrepresented <u>Heller</u>. . . . . . . . . . . . . . . . . . . . 5

II.   THE DISTRICT COURT FALSELY CLAIMS THAT MACHINEGUNS ARE
      DANGEROUS AND UNUSUAL WEAPONS, WHEN REALLY THEY ARE THE
      LINEAL DESCENDANTS OF FOUNDING-ERA FIREARMS. . . . . . . . . . . . . . . 12

III.  THIS COURT SHOULD DETERMINE THAT MACHINEGUNS ARE WITHIN
      THE SCOPE OF THE SECOND AMENDMENT, AND SHOULD NOT APPLY
      <u>MARZZARELLA</u>'S INTEREST-BALANCING TEST TO SIDESTEP THAT
      FINDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

Page

**HOLY BIBLE**
I Samuel 13:19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**U.S. CONSTITUTION**
Amendment II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**STATUTES**
18 U.S.C. § 922(o). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**CASES**
Ashwander v. TVA, 297 U.S. 288 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
District of Columbia v. Heller, 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . 2, *passim*
Harris v. Silvester, 2013 U.S. Dist. LEXIS 172946. . . . . . . . . . . . . . . . . . . . . . . 18
Harris v. Silvester, 41 F. Supp. 3d 927 (E.D. Cal. 2014). . . . . . . . . . . . . . . . 18, 20
Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . 16
Kolbe v. O'Malley, 42 F. Supp. 3d 768 (D. Md. 2014) . . . . . . . . . . . . . . . . . . . . 18
Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . 8, 9
Peruta v. San Diego, 678 F. Supp. 2d 1046 (S.D. Cal. 2010) . . . . . . . . . . . . . . 18
U.S. v. Fincher, 538 F.3d 868 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 5
U.S. v. Marzzarella, 614 F.3d 85 (3rd Cir. 2010). . . . . . . . . . . . . . . . . . 2, *passim*
U.S. v. Miller, 307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*

**MISCELLANEOUS**
B. Canfield, "The First Garands," American Rifleman, August 22, 2011. . . . . . . 13
G.L. Carter, Ph.D., An Encyclopedia of History, Politics, Culture,
        and the Law, ABC-CLIO (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Federalist No. 28, *The Federalist* (G. Carey & J. McClellan, eds.,
        Liberty Fund: 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
"M1 Garand .30 Caliber Semi-automatic Rifle:  Principal Rifle
        of World War II," World War 2 Headquarters. . . . . . . . . . . . . . . . . . . . . . . 13
B. Wexler, 50 Guns that Changed America:  An Illustrated Guide
        (Skyhorse Publishing: 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Yuri Suhl, ed., They Fought Back (N.Y.: Paperback Library,
        1968; 1st pub. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

iii

# INTEREST OF *AMICI CURIAE*[1]

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., The Heller Foundation, and Conservative Legal Defense and Education Fund are nonprofit organizations, and each is exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Institute on the Constitution is an educational organization. Each of the *amici* is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

## ARGUMENT

## I.   THE DISTRICT COURT WRONGLY TREATED APPELLANT'S CLAIM AS FORECLOSED BY <u>MARZZARELLA</u> AND <u>HELLER</u>.

The district court below stated that "<u>Heller</u> held and ... our Court of Appeals made pellucid in <u>Marzzarella</u> ... that '...the Second Amendment does not protect' possession of machine guns in the home." <u>U.S.</u> v. <u>One Palmetto States Armory PA-15 Machinegun Receiver/Frame</u> ("<u>Palmetto</u>"), 2015 U.S. Dist. LEXIS 95302, *44-45, 47 (E.D. Penn. 2015).  Consequently, "[b]ecause the Second Amendment does not protect machine gun possession, Watson's facial challenge to Section 922(o) and the NFA must fail." *Id.* at 48.

<u>Marzzarella</u>[2] may have said as much as the District Court stated, but <u>Heller</u>[3] said no such thing.  Rather, <u>Heller</u> confirmed that the Second Amendment secures a right of the People to possess the arms necessary for self-defense and a citizens militia in defense against tyranny.  <u>Heller</u> at 581, 598.  <u>Marzzarella</u>'s *dictum* about machineguns was ill-advised and erroneous.  Additionally, the rest of the <u>Marzzarella</u> opinion was so wrongly decided and so blatantly conflicts with <u>Heller</u> and with the Second Amendment's unambiguous text that it lacks any persuasive authority — to

---

[2]  <u>U.S.</u> v. <u>Marzzarella</u>, 614 F.3d 85 (3rd Cir. 2010).

[3]  <u>District of Columbia</u> v. <u>Heller</u>, 554 U.S. 570 (2008).

say nothing of precedential authority that would make it binding upon this Court, the

district court, or any other court.

### A.    Marzzarella Misrepresented the Authorities Relied Upon to Uphold the Machinegun Ban.

The Marzzarella panel erroneously claimed that "the Supreme Court has made

clear the Second Amendment does not protect ... [p]ossession of machine guns or

short-barreled shotguns...." Marzzarella at 94.  As authority for this claim, the panel

cited two cases, one purportedly governing short-barreled shotguns, and the other

governing machineguns.  Neither source supports the proposition that Marzzarella

claimed.

As to short-barreled shotguns, the Marzzarella panel cited U.S. v. Miller, 307

U.S. 174 (1939), claiming that Miller "h[eld] that short-barreled shotguns are

unprotected." Marzzarella at 94.  Miller says no such thing.  Instead, Miller stated

that:

> [i]n the absence of any evidence tending to show that possession or use
> of a [short-barreled shotgun] at this time has some reasonable
> relationship to the preservation or efficiency of a well regulated militia,
> we cannot say that the Second Amendment guarantees the right to keep
> and bear [a short-barreled shotgun].  Certainly it is not within judicial
> notice that this weapon is any part of the ordinary military equipment or
> that its use could contribute to the common defense.  [*Id.* at 178
> (emphasis added).]

3

There is a vast difference between not being able to say that something is so, and saying that something is **not** so.  This distinction apparently eluded the Marzzarella panel.  Only by ignoring Miller's prefatory phrase — "in the absence of any evidence" — could the Marzzarella panel arrive at the conclusion that Miller actually held that "short-barreled shotguns are unprotected."  *See* Appellant's Brief at 13.

As Justice Scalia noted in Heller, the Miller case was highly unusual in that the "defendants made no appearance ... neither filing a brief nor appearing at oral argument; the Court heard from no one but the Government...."  Heller at 623.  Without a complete record, then, the Court was unable to decide that short-barreled shotguns were protected arms.  But that in no way means the opposite, as the Marzzarella panel assumed, that the Miller Court denied that short-barreled shotguns are protected arms.

Indeed, by its qualifying language — "at this time" — the Supreme Court put future courts on notice that the record in Miller was unusually sparse, and future challenges would be needed to resolve, based on evidence, whether short-barreled shotguns are indeed protected arms, suitable for citizen self-defense and for the ultimate Second Amendment purpose of defense against government, should it become tyrannical.

4

In addition to its erroneous reliance on <u>Miller</u>, the <u>Marzzarella</u> panel also mistakenly claimed that "the Supreme Court has made clear" that machineguns are not protected arms.  For that proposition, <u>Marzzarella</u> cited neither <u>Miller</u>, nor <u>Heller</u>, nor any other Supreme Court case, but rather a case from the U.S. Court of Appeals for the Eighth Circuit — <u>U.S.</u> v. <u>Fincher</u>, 538 F.3d 868, 874 (8th Cir. 2008).  <u>Marzzarella</u> at 94-95.  It does not take a lawyer to recognize that Eighth Circuit opinions do not constitute binding Supreme Court precedent.  One would think that if the Supreme Court had ever held that machineguns are outside the scope of the Second Amendment, the <u>Marzzarella</u> panel would have cited such Supreme Court language.  The fact that the panel did not do so is fairly good evidence that no such holding exists and, indeed, *amici* are aware of no such holding.

### B.    The District Court Misrepresented <u>Heller</u>.

The district court assumed that <u>Heller</u> foreclosed the argument that machineguns are protected "arms" under the Second Amendment.  <u>Palmetto</u> at 44-45.  To the contrary, <u>Heller</u> stands for precisely the opposite proposition.  Indeed, <u>Heller</u> ruled that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms...."  <u>Heller</u> at 582.  Since the fully automatic M-16 at issue in this case is clearly a "bearable arm," then under <u>Heller</u> it is *prima facie* protected by the Second Amendment.  In order to reach the contrary conclusion, that

5

presumption must be rebutted.  Nothing in <u>Heller</u> ever rebutted the presumption, nor has any other Supreme Court case, before or since.

To fill in the gaping holes left by the <u>Marzzarella</u> *dictum* on machineguns, the district court below cobbled together fragments and *dicta* from <u>Heller</u>.  The district court first asserted that the Second Amendment right is "not unlimited," that there may be various "presumptively lawful regulatory measures," that some "longstanding prohibitions" may be constitutional, and that the right does not apply to "dangerous and unusual weapons."  *Id.* at 41-42.  Following this recitation of <u>Heller</u> *dicta*, the district court (i) noted that <u>Marzzarella</u> (not <u>Heller</u>) "link[ed] 'presumptively lawful regulators' [sic] with restrictions on dangerous and unusual weapons," (ii) labeled the machinegun ban as the former and machineguns themselves as the latter, and finally (iii) concluded that machineguns are "exceptions to the Second Amendment guarantee."  *Id.* at 44-45.

The district court then claimed "<u>Heller</u> held ... [t]he ban on machine guns outside the purely military context, like the felon dispossession statutes, is 'presumptively lawful....'"  *Id.* at 47.  The district court alleged that <u>Heller</u> created a "distinction between arms 'in common use' [which are] under Second Amendment protection and 'those weapons useful in warfare' — including machine guns — which fall outside the Amendment's protection."  *Id.* at 48.  But <u>Heller</u> never said

6

that.  In fact, <u>Heller</u> said just the opposite.  <u>Heller</u> rejected the idea that <u>Miller</u>

"'turned ... on the basic difference between the military and nonmilitary use and

possession of guns,'" concluding that "the words of the [Miller] opinion prove

otherwise." *Id.* at 622.

The district court asserted that the snippets it drew from <u>Heller</u> demonstrate

that machineguns are outside the scope of the Second Amendment.  The full <u>Heller</u>

discussion on this point admittedly could be more clear, but really it provides more

support for precisely the opposite conclusion from that reached by the district court.

<u>Heller</u>'s complete analysis of <u>Miller</u> reveals the point the <u>Heller</u> Court was making:

> Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that **only those weapons useful in warfare** are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939.  We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." ... The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense.  **In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.** ... Indeed, that is precisely the way in which the *Second Amendment's* operative clause furthers the purpose announced in its preface.  [*Id*. at 624-25 (emphasis added).]

7

Neither Miller nor Heller ruled that "ordinary military equipment" like an M-16 is **not** protected by the Second Amendment.  Rather, a fair reading of Heller would support the proposition that such ordinary military equipment **is** protected and, further, that it is **not the only type** of arm that is protected.[4]  Indeed, Heller notes that in the founding era, the same weapons were used for militia service in defense of the "free State," for private self-defense, and even for hunting, and other purposes.  Heller explained that the Second Amendment protects **more than ordinary military equipment**, and it is a "startling reading" of Heller to twist the passage to support the opposite proposition, as the district court does.

In Miller, the Supreme Court stated that weapons which are "part of the ordinary military equipment" are the sorts protected by the Second Amendment.  307 U.S. at 178.  Under that Miller test, as understood by Judge Silberman in his opinion for the D.C. Circuit (in the Parker[5] case that became the Heller case in the Supreme

---

[4]  This reading of the D.C. Circuit is not just the position of these *amici*, it was also the position advanced by then-Solicitor General Paul D. Clement before the U.S. Supreme Court.  In his *amicus* brief in Heller, the Solicitor General stated "because automatic rifles like the **M-16** are now standard-issue military weapons for rank-and-file soldiers, the court's reference to the **'lineal descendant[s]'** of the weapons used in Founding-era militia operations ... **on its face would cover machineguns**...." D.C. v. Heller, U.S. *amicus* brief at 22 (Jan. 11, 2008) (emphasis added). http://goo.gl/VDEMMX.

[5]  Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007).

Court), machineguns would seem to fall within the definition of protected "arms."

Judge Silberman stated "[t]he modern handgun — and for that matter the rifle and

long-barreled shotgun — is undoubtedly quite improved over its colonial-era

predecessor, but it is, after all, a **lineal descendant of that founding-era weapon,**

**and it passes *Miller's* standards**." Parker at 398 (emphasis added). *See also* Section

II, *infra*.

Later, Heller addressed an argument about the scope of the Second

Amendment, based on an assumption that M-16 rifles may be banned:

> It may be objected that **if** weapons that are most useful in military
> service — M-16 rifles and the like — **may be banned**, then the Second
> Amendment right is completely **detached** from the **prefatory clause**.
> But as we have said, the conception of the militia at the time of the
> Second Amendment's ratification was the body of all citizens capable
> of military service, who would bring the sorts of lawful weapons that
> they possessed at home to militia duty.  It may well be true today that a
> militia, to be as effective as militias in the 18th century, **would require**
> **sophisticated arms** that are **highly unusual** in society at large.  Indeed,
> it may be true that no amount of small arms could be useful against
> modern-day bombers and tanks.   But the fact that **modern**
> **developments** have limited the **degree of fit** between the prefatory
> clause and the protected right **cannot change our interpretation of the**
> **right**.  [Heller at 627-28 (emphasis added).][6]

---

[6] Of course, there is a big difference between "presupposing" a ban on M-16
rifles in order to address a different argument, and "ruling" that they may be banned.

Although this passage is far from a model of clarity, <u>Heller</u> seems to indicate that

private ownership of M-16 rifles provides a better "degree of fit" with the militia

prefatory clause than does a ban on their ownership.  Further, even though military

rifles cannot stop tanks and planes, they are no less needed by a citizen militia to

resist tyranny and, therefore, are protected by the Second Amendment.[7]  The fact that

a fully automatic rifle used by the military is allegedly "highly unusual" in civilian

hands today (solely because it has been virtually banned by the government) does not

cause it to lose its protection as an "arm" under the Second Amendment.  Indeed, if

post-1986 machineguns like the M-16 were not banned under federal law, there is no

---

[7]  In no way did Justice Scalia's comment about the lack of utility of small arms resisting bombers and tanks indicate that small arms are not the mainstay of an effective militia organized to resist tyranny.  Indeed, no weapon that has ever been made has been useful for all purposes.  A historical constant, though, is that those in power who were tyrants, or who sought to be tyrants, have sought to limit the weapons owned by the people over whom they rule.  For a time, the children of Israel were not allowed to have blacksmiths who could fashion weapons against the Philistines.  *See* I Samuel 13:19.  Shogun Toyotomi Hideyoshi issued an edict in the 16th century that "[t]he people in the various provinces are strictly forbidden to have in their possession any swords, short swords, bows, spears, firearms or other arms. The possession of unnecessary implements ... tends to foment uprisings."  G.L. Carter, Ph.D., <u>An Encyclopedia of History, Politics, Culture, and the Law</u>, ABC-CLIO (2012).  During World War II, the importance of small arms was demonstrated in the Warsaw Ghetto, where hundreds of Jewish families were reported to have had fewer than a dozen handguns among them, yet they were able to frustrate well-armed Nazi troops.  *See generally* Yuri Suhl, ed., <u>They Fought Back</u> (N.Y.: Paperback Library, 1968; 1st pub. 1967).  Indeed, in 1776 few Englishmen imagined that a rag-tag group of disorganized colonists could engage the British Empire in war and emerge victorious.

10

doubt that hundreds of thousands, if not millions, of Americans would have chosen to purchase M-16s instead of their AR-15s — the M-16's neutered semi-automatic cousin.

The common-use test cannot override the text of the Second Amendment, whose purpose is to preserve a "free State" by securing to the people the ability to take up effective arms against a tyrant. Alexander Hamilton understood that the federal government could become tyrannical, and the people's need to be able to defend themselves was essential: "If the representatives of the people betray their constituents, there is then no resource left but in the exertion of that original right of self-defence, which is paramount to all positive forms of government...." Federalist No. 28, *The Federalist* at 138 (G. Carey & J. McClellan, eds., Liberty Fund: 2001).

Finally, the district court fails to mention that immediately after its reference to fully automatic weapons, the <u>Heller</u> Court stated that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." <u>Heller</u>, at 626. As in <u>Miller</u>, the parties in <u>Heller</u> never litigated whether machineguns were arms. *See* <u>D.C.</u> v. <u>Heller</u>, Brief for *amicus curiae* United States, *supra*, at 20-24; *see also* Brief for respondent Heller (Feb. 4, 2008) at 50-52; *see also* <u>Heller</u> at 624.[8]

---

[8] There was no indication in the <u>Heller</u> opinion that the Court meant to violate its cardinal rule governing constitutional litigation: "not [to] pass upon the constitutionality of legislation in a friendly, non-adversary, proceeding....'"

Any comments in <u>Heller</u> about fully automatic weapons were, first and foremost, comments clarifying the scope of the issue being decided and, at worst, *dicta* — but either way, never intending to resolve or foreclose future consideration of the issue presented in this case.

## II.  THE DISTRICT COURT FALSELY CLAIMS THAT MACHINEGUNS ARE DANGEROUS AND UNUSUAL WEAPONS, WHEN REALLY THEY ARE THE LINEAL DESCENDANTS OF FOUNDING-ERA FIREARMS.

The district court claims that machineguns are "dangerous and unusual weapons," citing <u>Heller</u> (erroneously) and the decisions of other courts of appeals. <u>Palmetto</u> at 49-50.  The district court notes "the capacity of modern machine guns to fire more than 1,000 rounds per minute...." *Id.* at 50-51.  The government argues that "machine guns can deliver 'murderously effective firepower' and their high rate of fire can allow 'a shooter to kill dozens of people within a matter of seconds.'" Government's Br. (Jan. 16, 2015) at *25.  The government continues that "[t]he dangers machine guns pose to public safety and to law enforcement officers warrant stringent limitations on the possession and transfer of machine guns in private hands." *Id.*

---

<u>Ashwander</u> v. <u>TVA</u>, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring).

Although **fully automatic** weapons like the M-16 (first deployed by the U.S. military in 1963) may seem unusual to some, their functionality is properly viewed as an evolutionary improvement over their predecessors. Indeed, at each level in the evolutionary chain of firearms over the past two centuries, one could anticipate this same objection being raised to each new advancement in the technology of firearms — that they now have become too powerful and frightening to be owned by civilians.

Presumably, when **semi-automatic** firearms were developed over a century ago, some could have claimed they were unusual and frightening when compared with the bolt-action, lever-action, pump-action, and revolver action firearms that preceded them. The famous M-1 Garand, a semi-automatic rifle with 8-round "clips" of ammunition that can be quickly loaded, became the first semi-automatic rifle to be standard issue for a nation's army in World War II.[9] Consequently U.S. troops outclassed the limited firepower of the Soviets' fixed-magazine, bolt-action Mosin Nagants and the Germans' fixed-magazine, bolt-action Mausers.[10]

_____

[9] *See* B. Canfield, "The First Garands," American Rifleman, August 22, 2011, http://www.americanrifleman.org/articles/2011/8/22/the-first-garands/.

[10] *See* "M1 Garand .30 Caliber Semi-automatic Rifle: Principal Rifle of World War II," World War 2 Headquarters, http://worldwar2headquarters.com/HTML/weapons/american/garand. html ("A well trained soldier could place 32 rounds per minute on target, more than twice the number of rounds that could be well aimed and fired from a bolt action rifle in one minute.").

When "repeating" arms became popular roughly one and one-half centuries ago, their firepower seemed incredible to some, since such weapons "gave a single man the firepower of a dozen marksmen armed with muzzle-loading muskets."[11] Henry Repeating Arms Company marketed its lever-action rifles as being able to fire "sixty shots per minute." B. Wexler, 50 Guns that Changed America:  An Illustrated Guide (Skyhorse Publishing: 2015) at 65.  Indeed, "[d]ue to its revolutionary design and rapid rate of fire, the Henry quickly found popularity both with the military and civilian purchasers."  Id. at n.19.

And when the firearm cartridge itself — consisting of a bullet, powder, casing, and primer all contained in a single unit — gained a foothold in the mid- to late 1800's, this development also greatly increased a weapon's rate of fire.  Some breech-loading rifles were found to have a 250 percent faster rate of fire than muzzle-loading rifles that had preceded them, which required that each component be loaded individually.  Wexler at 56.  And with muzzle-loading muskets and long rifles, we have come back full circle to the weapons used during the founding era when the Second Amendment was ratified.

---

[11]  https://www.henryrifles.com/henry-history/.

At each step along their evolutionary chain,[12] the same claims about lethality, rate of fire, and effectiveness could be made that are now being made by the government regarding machineguns: that these "new" firearms have a rate of fire far in excess of those available from their predecessors.  That puts these "new" firearms on a different plane than those which came before.  To use the government's words, each generation of "new" firearms have "murderously effective firepower" compared to the last generation of firearms.  These "new" firearms enable the shooter to engage a far greater number of targets more effectively than their predecessors.  But <u>Heller</u> rejected such arguments as:

> bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.  We do not interpret constitutional rights that way.  Just as the First Amendment protects modern forms of communications, ... and the Fourth Amendment applies to modern forms of search, ... the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.[13]  [*Id.* at 582.]

---

[12]    This section is not intended to give a comprehensive history of the development of modern small arms.  Volumes have been written on that subject.  The point here is to give some examples of the many types of firearms that, in their day, were considered to provide revolutionary improvements in firepower, yet today seem all but obsolete.

[13]    Conversely, the <u>Marzzarella</u> panel snubbed its nose at <u>Heller</u>, concluding that firearm serial number requirements  are constitutional because "[i]t would make little sense to categorically protect a class of weapons bearing a certain characteristic when, at the time of ratification, citizens had no concept of that characteristic or how it fit within the right to bear arms."  *Id.* at 94.

**III.   THIS COURT SHOULD DETERMINE THAT MACHINEGUNS ARE WITHIN THE SCOPE OF THE SECOND AMENDMENT, AND SHOULD NOT APPLY <u>MARZZARELLA</u>'S INTEREST-BALANCING TEST TO SIDESTEP THAT FINDING.**

The district court actually began its Second Amendment analysis in a way increasingly unusual compared to many other federal courts — it quoted the text of the Second Amendment.  <u>Palmetto</u> at 32.  The district court also correctly recognized and enunciated the proper framework for analyzing Second Amendment issues: "[t]he Supreme Court reached <u>Heller</u>'s holding ... by parsing the Amendment's text, reviewing analogous state statutes and constitutions, and tracking the Amendment's historical understanding."  <u>Palmetto</u> at 41.

However, while off to a good start, the district court quickly veered off track, deferring to an entirely different mode of analysis that it recognized was "devised" (*i.e.*, "contrived," "invented," or "imagined") by a prior panel of this Court.  *Id.* at 44. Rather than using what has become known as the <u>Heller</u> "text, history, and tradition" framework,[14] the district court deferred to the "two-part test" invented by the <u>Marzzarella</u> panel (<u>Palmetto</u> at 44), Step Two of which requires judges to engage in precisely the "judge-empowering 'interest-balancing inquiry'" that <u>Heller</u> forbids. <u>Heller</u> at 634.

---

[14]  *See* <u>Heller</u> v. <u>District of Columbia</u>, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J. dissenting).

In this case, the district court did not find it necessary to reach Step Two of that balancing test, having found under Step One that machineguns do not even fall within Second Amendment protection.  <u>Palmetto</u> at 48.  However, having deferred to the <u>Marzzarella</u> test, the district court indicated that it was poised to engage in balancing should Step Two become necessary.

If this panel is to find, consistent with the analysis above, that machineguns are "bearable arms" within the scope of the Second Amendment's protection, it should not then give in to the temptation to engage in <u>Marzzarella</u>'s Step Two balancing test[15] — subordinating express constitutional rights to vague, amorphous policy notions of public safety and crime prevention.  Indeed, in <u>Marzzarella</u>, a panel of this Court claimed that "we need not decide whether Marzzarella's right to bear arms was infringed ... [b]ecause we conclude § 922(k) would pass constitutional muster even if it burdens protected conduct....'"  *Id.* at 95.  This is a startling conclusion, since the Second Amendment text declares unequivocally that Marzzarella's right "shall not be infringed." The Second Amendment does not say "shall not be infringed unless it seems reasonable," or "shall not be infringed unless the law meets the appropriate

---

[15]  A "test for assessing firearm bans that eviscerate many of the protections recognized in *Heller* and *McDonald*."  <u>Friedman</u> v. <u>Highland Park</u>, 577 U.S. ___ (2015) (No. 15-133) (Thomas, J. dissenting from denial of certiorari) (Dec. 7, 2015) at 4.

standard of scrutiny."  Once a court has determined that a right that shall not be infringed has, in fact, been infringed, the case is over, and the statute must be struck down.  Remarkably, the <u>Marzzarella</u> panel recognized that the challenged statute infringed Second Amendment rights, taking no action because "§ 922(k) does not come close to th[e] level of infringement [found in <u>Heller</u>]."  *Id.* at 97.  Without explanation, the panel appointed to itself the power to uphold a federal law that infringed a right that the Constitution states "shall not be infringed."[16]

Disregarding the constitutional text, the <u>Marzzarella</u> panel instead decided that First Amendment balancing tests should govern Second Amendment challenges (*id.*

---

[16] Unfortunately, the Third Circuit panel is not the only federal court that has permitted the unconstitutional "infringement" of a right that the Founders declared "shall not be infringed."  *See* <u>Peruta</u> v. <u>San Diego</u>, 678 F. Supp. 2d 1046, 1055 (S.D. Cal. 2010) (noting that "by imposing a 'good cause' requirement before a concealed weapon's [sic] permit can be issued, the State undoubtedly infringes Plaintiff's right to 'possess and carry weapons in case of confrontation,'" but then stating that "[f]or such infringement to pass constitutional muster, Defendant must at the very least demonstrate that it is necessary ....."); *see also* <u>Kolbe</u> v. <u>O'Malley</u>, 42 F. Supp. 3d 768, 789 (D. Md. 2014) (after "assum[ing] the Firearm Safety Act infringes on the Second Amendment," ruling that its infringement upon the right to keep and bear arms could be justified under intermediate scrutiny as a means to better ensure Maryland's public safety ends.); *see also* <u>Harris</u> v. <u>Silvester</u>, 2013 U.S. Dist. LEXIS 172946 at *8-9 (noting that the defendant "at a minimum concedes that [the law] is a burden and/or infringement on the right to keep and bear arms," but still holding a trial before ultimately deciding that the statute had **too severely infringed** Second Amendment rights without doing enough to further California's alleged interests. (41 F. Supp. 3d 927, 962, 964, 967, 970, 971 (E.D. Cal. 2014)).

18

at 89, 96-97),[17] that the First Amendment test of "intermediate scrutiny" was the appropriate test to apply (*id.* at 97), and that the challenged statute met the requirements under both intermediate and strict scrutiny (*id.* at 98, 99).

Step One of the two-step test "ask[s] whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Marzzarella, 614 F.3d at 89.  Indeed, that first step should be the only step — either the conduct is within the scope of Second Amendment protection, or it is not; either Second Amendment rights are infringed, or they are not; and thus a law is either unconstitutional, or it is not.  However, if the law burdens Second Amendment conduct, Step Two invented by the Marzzarella panel "evaluate[s] the law under some form of means-end scrutiny" and, "[i]f the law passes muster under that standard, it is constitutional."  *Id.*  Step Two thus replaces the Second Amendment's standard of "shall not be infringed" with the Court's test of "intermediate or strict scrutiny."  This allows courts to avoid results that the Constitution requires, but which some judges appear not to like.

---

[17]  During oral argument in Heller, Chief Justice Roberts showed no patience with importing First Amendment balancing tests to decide Second Amendment issues, calling them "baggage."  District of Columbia v. Heller Oral Argument (Mar. 18, 2008), p. 44, ll. 5-23 (emphasis added).

Since the <u>Heller</u> decision, too many federal judges have not been content to give the unambiguous words of the Second Amendment their simple, plain meaning, choosing instead to devise multi-part tests by which judges empower themselves to substitute their judgment for those who wrote and ratified the Second Amendment. Complicating <u>Heller</u> with a judge-created "step two," many federal judges first use something of a sliding scale to decide whether a given law "burdens" (infringes) what they categorize as either "core" or non-"core" Second Amendment conduct. *See, e.g.,* <u>Harris</u> v. <u>Silvester</u>, 41 F. Supp. 3d 927, 961 (E.D. Cal. 2014). This treats Second Amendment rights as concentric layers of an onion, with the microscopic "core" right being <u>Heller</u>'s narrow factual holding precluding complete bans on ownership of handguns for self-defense in the home. *Id.* Judges then use another sliding scale to decide, according to their individual sensibilities, how severe the burden on the protected conduct seems to them. *Id.* Then, adding onto these multiple layers of subjective analysis, judges reject the <u>Heller</u> majority opinion and instead follow the lead of Justice Breyer's <u>Heller</u> dissent, deciding whether to apply either a strict scrutiny or intermediate scrutiny balancing test. *Id.* The Second Amendment, however, grants federal judges no such authority.

## CONCLUSION

Because M-16s are "bearable arms" which are the lineal descendants of the weapons brought to muster on the village green by founding-era militiamen, the district court erred when it concluded that such firearms are not even within the scope of the Second Amendment. This panel should interpret the Second Amendment in a matter consistent with the approach mandated in the <u>Heller</u> case. Under <u>Miller</u>, bearable arms that are "ordinary military equipment" (like the M-16) are protected by the Second Amendment. Under <u>Heller</u>, all bearable arms (like the M-16) are "*prima facie*" protected.

Respectfully submitted,

/s/ Robert J. Olson

_____

ROBERT J. OLSON*
WILLIAM J. OLSON
HERBERT W. TITUS
JEREMIAH L. MORGAN
JOHN S. MILES
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
December 9, 2015           Vienna, VA  22180-5615
*Attorney of record      (703) 356-5070
  *Attorneys for Amici Curiae*

21

# REQUIRED CERTIFICATIONS

IT IS HEREBY CERTIFIED:

1.    That the foregoing Brief Amicus Curiae of Gun Owners of America, *et al.* in Support of Appellant and Affirmance complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,936 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 14.0.0.756 in 14-point Times New Roman.

3.    I am a member in good standing of the bar of this Court.

4.    The text of the electronic brief is identical to the text in the paper copies.

5.    The electronic brief has been scanned for viruses using Symantec Endpoint Protection version 12.1.6 and no virus was detected.

　/s/ Robert J. Olson　　
Robert J. Olson
Attorney for *Amici Curiae*

Dated:  December 9, 2015

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief Amicus Curiae of Gun Owners of America, *et al*. in Support of Appellant and Affirmance was made, this 9th day of December, 2015, by the Court's Case Management/Electronic Case Files system upon the attorneys for the following parties:

Appellant Ryan S. Watson

Appellees Attorney General of the United States of America, *et al*.

_____/s/ Robert J. Olson_____
Robert J. Olson
Attorney for *Amici Curiae*